# In the United States Court of Federal Claims

**No. 24-440C**
**Filed: September 8, 2024**

**Corrected Version Issued for Publication: October 7, 2024[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **HANFORD TANK DISPOSITION ALLIANCE, LLC (HTDA),** | \* |
| | \* |
| Protestor, | \* |
| | \* |
| **v.** | \* |
| | \* |
| **UNITED STATES,** | \* |
| | \* |
| Defendant, | \* |
| | \* |
| | \* |
| **v.** | \* |
| | \* |
| **HANFORD TANK WASTE OPERATIONS & CLOSURE, LLC (H2C),** | \* |
| | \* |
| | \* |
| Defendant-Intervenor. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

**Kevin P. Mullen**, Morrison & Foerster LLP, Washington, DC, for protestor. With him were **Sandeep N. Nandivada**, **James A. Tucker**, **Victoria Dalcourt Angle**, and **Markus G. Speidel**, Morrison & Foerster LLP, Washington, DC.

**Stephen C. Tosini**, Department of Justice, Washington, DC, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With him were **Deborah A. Bynum**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Assistant Attorney General, Civil Division. Of counsel **Ada Mitrani**, Department of Energy, Washington, DC.

---

[1] This Opinion was issued under seal on September 8, 2024. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with some of the redactions that the parties proposed in response to the court's request in addition to corrections to the September 8, 2024 Opinion. Words which are redacted are reflected with the notation: "[redacted]."

**Luke W. Meier**, Blank Rome LLP, Washington, DC, for intervenor. With him was **Scott Arnold**, **Stephanie M. Harden**, **Michael J. Montalbano**, and **David L. Bodner**, Blank Rome LLP, Washington, DC.

# O P I N I O N

<u>**HORN, J.**</u>

Protestor, Hanford Tank Disposition Alliance, LLC (HTDA), filed the above captioned post-award bid protest in the United States Court of Federal Claims challenging the decision of the United States Department of Energy to award a contract to intervenor, Hanford Tank Waste Operations & Closure, LLC (H2C), in response to Request for Proposal No. DE-SOL-89303321REM000084 (the Solicitation). Given the requirements of the parties, the court previously issued an oral decision on August 28, 2024, to the parties in the above captioned bid protest. This Opinion memorializes the oral decision provided to the parties.

## FINDINGS OF FACT

As explained by the agency in the July 21, 2021 Acquisition Plan related to the Solicitation at issue in the above captioned protest:

> Beginning in 1943, the U.S. Department of Energy (DOE) Hanford Site was constructed to produce plutonium for the first nuclear weapons in World War II. To meet the challenges of the "Cold War," [redacted]. Plutonium production ended in the late 1980s. Today, the Hanford Site is a key DOE industrial complex dedicated to environmental cleanup.

The July 21, 2021 Acquisition Plan continued:

> The Hanford Site sits on 586 square miles of shrub-steppe desert in southeastern Washington State and encompasses over 40 miles of the Columbia River. The Hanford Site cleanup strategy is to eliminate or minimize nuclear materials, spent nuclear fuel (SNF), and waste through safe stabilization, treatment, and/or disposition; reduce the costs of continuing operations and surveillance and maintenance; deactivate and decommission facilities; as well as to remediate surface water, groundwater and contaminated soils consistent with regulatory agreements and permits. The Department's completion strategy provides a comprehensive risk-based methodology to the legacy cleanup project, such as the dispositioning of low-activity tank waste by vitrification at the site's Waste Treatment and Immobilization Plant (WTP) Facilities, and decommissioning facilities including associated infrastructure that are not required for continuing missions. The Hanford Site cleanup is expected to be completed in fiscal year (FY) 2079.

Beginning in the 1940s with the Manhattan Project, the Hanford Site played a pivotal role in the nation's defense, producing approximately 67 metric tons of plutonium, nearly two-thirds of the United States' supply. After irradiated fuel rods were taken from the nuclear reactors to the processing facilities, they were exposed to a series of chemical processes designed to dissolve away the fuel rod itself, allowing retrieval of the plutonium. The radioactive chemical liquid waste generated during the plutonium extraction process was put into underground storage tanks. [redacted].

The July 21, 2021 Acquisition Plan explained:

The DOE has a long term need for a contractor to operate the WTP and Tank Farms. The WTP is in varying stages of construction and startup with the low activity waste (LAW) treatment facilities to be commissioned and operated in the near term followed by the high-level waste portion later in the contract period.

The Solicitation, Request for Proposal No. DE-SOL-89303321REM000084, originally was issued on October 21, 2021 as a FAR part 15 negotiated procurement, and the Solicitation explained that "[t]his is an Indefinite-Delivery/Indefinite-Quantity (IDIQ) Contract under which Cost-Reimbursement (CR) and/or Fixed-Price (FP) Task Orders may be issued." (alteration added). The Solicitation had a maximum value of services of $45,000,000,000.00, with a ten year contract ordering period from the effective date of the contract.

In response to the Solicitation, offerors were instructed to provide the agency a "Technical and Management Proposal," which included the offerors' key personnel, the offeror's past performance, and the offeror's management approach. The offeror also was to include a price proposal. For the Key Personnel evaluation factor, the Solicitation stated, in part:

**M.2 Evaluation Factor – Key Personnel**[2]

(a) Key Personnel. DOE will evaluate the proposed required Program Manager and Operations Manager (required key personnel) and up to three additional non-required key personnel, along with the Offeror's rationale for selecting the proposed non-required key personnel positions and why the positions are essential to the successful performance of the entire Master IDIQ PWS [Performance Work Statement]. The Program Manager and Operations Manager are considered equal in importance. The Program Manager and Operations Manager individually are significantly more important than the non-required key personnel individually. Failure of the Offeror to propose the required key personnel positions, or to confirm the availability of all proposed key personnel as being assigned to the Contract

---

[2] The "M" in the Solicitation refers to **Section M Evaluation Factors for Award**." (capitalization and emphasis in original).

full-time and that their permanent duty station is located on the Hanford site or within the local area, will adversely affect the Government's evaluation of the proposal and may make the proposal ineligible for award. Additionally, failure of the Offeror to provide a letter of commitment for each key personnel will adversely affect the Government's evaluation of the proposal.

(capitalization and emphasis in original; alteration added). For the Past Performance evaluation factor, the Solicitation stated, in part:

**M.3 DOE-M-2008, Evaluation Factor – Past Performance (Oct 2015) (Revised)**

(a) Offeror. The Offeror, to include all members of a teaming arrangement, as defined in FAR 9.601(1) will be evaluated on the Government's assessment of relevant and recent past performance information obtained for the Offeror performing work similar in scope, size, and complexity to the portion of the Master IDIQ PWS that each entity is proposed to perform. The information will be evaluated in order to assess the Offeror's potential success in performing the work required by the Contract. Similar scope, size, and complexity are defined as follows based on the portion of work that each entity is proposed to perform: scope – type of work (e.g., work as identified in the Master IDIQ PWS, including similar work of a non-nuclear nature and/or similar non-DOE work such as operating facilities with significant chemical/industrial hazards comparable to typical commercial chemical industry facilities regulated by the Occupational Safety and Health Administration and in some cases using the Occupational Safety and Health Administration's Process Safety Management framework); size – dollar value (approximate average annual value in relation to the proposed work; annual contract value of approximately $400M for evaluation purposes); and complexity – performance challenges (e.g., operating a first of a kind facility; operating DOE nuclear Hazard Category 2 or facilities; overcoming barriers to maintaining operating production levels; overcoming issues related to maintenance and obsolescence; subcontractor management; management of large complex contracts in highly regulated industries; management of complex Contractor Human Resource Management (CHRM) requirements; and successful partnerships with the Government, Client, and Regulators). The higher the degree of relevance of the work, the greater the consideration that may be given. DOE will evaluate recent past performance information for contracts that are currently being performed or have a period of performance end date within the last 4 years from the original solicitation issuance date. To the extent that performance evaluations are divisible, the Government will only evaluate performance that occurred within the four (4) year period preceding the original solicitation issuance date. More recent past performance information may be given greater consideration.

(capitalization and emphasis in original). For the Management Approach evaluation factor, the Solicitation provided:

### M.4 Evaluation Factor – Management Approach

(a) Contract Transition Approach. DOE will evaluate the Offeror's approach to achieve the Contract Transition Task Order requirements, for the safe, effective, and efficient transfer of responsibility for execution of the Master IDIQ Contract with little or no disruption to ongoing operations.

(b) Management Approach. DOE will evaluate the Offeror's management approach to: effectively negotiate, manage, implement and execute multiple simultaneously performed Task Orders for the Master IDIQ PWS; integrate and enhance OSHA safety culture of comparable typical commercial chemical industry with the existing nuclear facility ISMS; integrate tank farm and WTP operations; vision of optimal solutions for disposition of tank waste to achieve significant risk and financial liability reduction; interface and collaborate with other site contractors; and partner with the DOE and the Regulators.

(c) Small Business Participation. DOE will evaluate the Offeror's approach to meet or exceed the small business subcontracting requirement of 18 percent of the cumulative value of Task Orders, including subcontracting of meaningful work scope.

(capitalization and emphasis in original).

For price, the Solicitation stated:

### M.5 Evaluation Factor – Cost and Fee/Profit

The Cost and Fee/Profit Proposal will not be adjectivally rated or point scored, but will be considered in the overall evaluation of proposals in determining the best value to the Government. The Cost and Fee/Profit Proposal will be evaluated for cost realism and price reasonableness in accordance with FAR 15.404-1 and price [sic] FAR 15.402(a). Cost realism analysis will be performed on the Offeror's proposed Transition Task Order costs. This analysis will be used to determine whether the proposed cost elements are realistic for the work to be performed and reflect a clear understanding of the transition requirements. The transition cost proposal will be compared to the Volume II proposal for consistency and understanding of the requirements. Price reasonableness will be performed on both the proposed fully burdened labor rates (excluding fee) for the period February 1, 2023 through January 31, 2024 applied to the DOE provided Estimated Direct Productive Labor Hours and of the proposed key personnel costs. Key personnel compensation is capped at $568,000 for each designated key person, as established by Section 702 of the Bipartisan Budget Act of 2013.

For purposes of determining the best value, the evaluated price will be the total of the proposed fee/profit (all fee/profit proposed by Task Order type) for a 1-year period (not exceeding the identified fee limitations), proposed costs for Key Personnel (up to the compensation limits shown above), proposed costs for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours (Offeror's additional proposed direct labor categories included in L-6g[3] shall not be used to compute the evaluated price for award purposes), and realistic costs for the Transition Task Order period. Mathematical errors shall be corrected to compute the evaluated price. An Offeror that proposes a fee amount exceeding the maximum prescribed available award fee, target fee, and/or fixed fee amounts as specified in Section L may be considered unacceptable for award.

(capitalization and emphasis in original; alteration added).

The Solicitation provided an explanation to the potential offerors for how the proposals would be evaluated by the agency:

**M.6 DOE-M-2011 Relative Importance of Evaluation Factors (Oct 2015)**

(a) The relative importance of the evaluation factors for the Technical and Management Proposal (Volume II) are below.

(1) Key Personnel;
(2) Past Performance; and
(3) Management Approach.

Key Personnel is more important than Past Performance and Management Approach. Past Performance and Management Approach are considered equal in importance.

(b) The evaluation factors for the Technical and Management Proposal (Volume II), when combined, are significantly more important than the total evaluated price (Volume III). Each evaluation factor applicable to this solicitation is identified and described in this and other provisions of this Section M. The descriptive elements of each evaluation factor will be considered collectively in arriving at the evaluated rating of the Offeror's proposal for that evaluation factor. Areas within an evaluation factor are not sub-factors and will not be individually rated, but will be considered in the overall evaluation for that particular evaluation factor.

---

[3] "L-6g" refers to Attachment L-6, "Cost and Fee/Profit Elements Workbook," which was included with the Solicitation.

(capitalization and emphasis in original). Additionally, the Solicitation explained the agency's basis for making an award under the terms of the Solicitation:

**M.7 DOE-M-2012 Basis for Award (Oct 2015)**

The Government intends to award one contract to the responsible Offeror whose proposal is determined to be the best value to the Government. Selection of the best value to the Government will be achieved through a process of evaluating each Offeror's proposal against the evaluation factors described above. The evaluation factors for the Technical and Management Proposal will be adjectivally rated. The Cost/Price evaluation factor will not be rated, however the evaluated price will be used in determining the "best value" to the Government. The Government is more concerned with obtaining a superior Technical and Management Proposal than making an award at the lowest evaluated price. However, the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated superiority of one Offeror's Technical and Management Proposal over another. Thus, to the extent that Offerors' Technical and Management Proposals are evaluated as close or similar in merit, the evaluated price is more likely to be a determining factor in selection for award.

(capitalization and emphasis in original).

The Solicitation incorporated numerous FAR provisions by reference, including "FAR 52.204-7 System for Award Management (Oct 2018)." FAR 52.204-7(b)(1) states: "An Offeror is required to be registered in SAM [System for Award Management] when submitting an offer or quotation, and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation." FAR 52.204-7(b)(1) (2023) (alteration added).

After the Solicitation was issued, the agency issued five amendments to the Solicitation between October 26, 2021 and September 26, 2022. In response to the Solicitation, the agency received two proposals on January 6, 2022, one from protestor and one from intervenor. After review of the initial proposals, the agency issued requests for proposal clarifications, sent a December 12, 2022 "Competitive Range Notice/Open Discussions Letter" to both offerors, and ultimately sent both offerors on December 20, 2022, "Closing Discussions Letter/Request for Final Proposal Revisions."

On January 10, 2023, both protestor and intervenor submitted final, revised proposals to the agency. After evaluation, the agency issued the "Notice of Contract Award" to intervenor on April 13, 2023. Protestor requested a debriefing following the notice of award to intervenor, and at the debriefing, the agency provided the following evaluation chart:

| Vol. II - Technical & Management Evaluation Factors* | HTDA [Protestor] | H2C [Intervenor] |
|---|---|---|
| Key Personnel | Outstanding | Outstanding |
| Past Performance | Good | Good |
| Management Approach | Good | Good |
| **Vol. III - Cost and Fee/Profit Evaluation** | **HTDA** | **H2C** |
| **Total Evaluated Price** | **$655,017,626** | **$635,083,6485** |

After the debriefing, protestor filed an earlier, post-award bid protest in the United States Court of Federal Claims on May 8, 2023 in Case No. 23-683C, which was assigned to the undersigned. Protestor's bid protest complaint in Case No. 23-683C contained seven counts, challenging various aspects of the award to intervenor. Notably, in count six in Case No. 23-683C, protestor alleged "H2C [intervenor] does not appear to be registered in SAM, which is the official registry for federal offerors and contractors. Under most competed procurements (including this one) other than very low-value contracts, failure to have been registered in SAM at the time of proposal submission precludes award to an offeror," and "[a]s of this [May 8, 2023] date, an entity search in SAM for Hanford Tank Waste Operations & Closure LLC does not return any results, among either the active or inactive SAM profiles." (alterations added). Protestor argued: "This suggests H2C was not registered in SAM at the time it submitted its proposal for this competition and/or did not maintain continual registration until time of award, in violation of FAR 52.204-7."

In response to protestor's allegation that the intervenor was not registered in SAM, the court had the parties brief the SAM registration issue and held multiple hearings to address the SAM registration issue in Case No. 23-683C. On June 12, 2023, the court issued a decision in Case No. 23-683C. The court noted that

on May 12, 2023, defendant, the United States, filed a notice in this court which stated, in part: "Intervenor, Hanford Tank Waste Operations & Closure, LLC's (H2C), SAM registration is insufficient to meet the requirements of the solicitation because H2C did not 'continue to be registered' at all times from the date of its initial proposal." The defendant's notice continued:

Specifically, H2C was registered in SAM on the dates of its initial proposal [January 6, 2022] and award [April 13, 2023], but its registration lapsed during the intervening period, from about August 13, 2022, through January 24, 2023. At the time of its final revised proposal [January 10, 2023], H2C

> [intervenor] informed the Department of Energy (DOE) that it had held an active SAM registration at the time of initial proposal submission but it has since expired. H2C is in the process of reactivating its SAM registration, and should have an active registration shortly. In the interim, H2C submits the section K individual Reps and Certs with this final proposal revision.

Hanford Tank Disposition All., LLC v. United States, No. 23-683C, 2023 WL 5167489, at *1 (Fed. Cl. June 30, 2023),[4] appeal dismissed, No. 2023-2272, 2024 WL 3085479 (Fed. Cir. June 21, 2024) (alterations in original). The court concluded:

> After holding multiple hearings with the parties regarding the SAM issues and careful review of the parties' written submissions, the court finds intervenor's proposal did not comply with FAR 52.204-7(b)(1), which was a mandatory requirement in the procurement at issue in this protest. Therefore, the award to intervenor was improper and the award is set aside, and performance of the contract is enjoined.

> After review of this court's determination, the agency should reassess the procurement, including consideration of the intervenor's proposal and the protestor's proposal. If either protestor or intervenor disagree with the actions of the agency's reconsideration of how to proceed, or wish to challenge a subsequent award regarding the work contemplated by Request for Proposal No. DE-SOL-89303321REM000084, either protestor or intervenor may file a bid protest in this court . . . . As determined above, performance of intervenor H2C's contract is **ENJOINED**. The above captioned protest is **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this Order.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *3 (emphasis and capitalization in original; omission added). In response to the court's decision, on August 8, 2023, intervenor filed an appeal to the United States Court of Appeals for the Federal Circuit. See Hanford Tank Disposition All., LLC v. United States, No. 2023-2272. Subsequently, on June 21, 2024, in response to intervenor's request to voluntarily dismiss the appeal, the Federal Circuit dismissed the appeal. See Hanford Tank Disposition All., LLC v. United States, No. 2023-2272, 2024 WL 3085479 (Fed. Cir. June 21, 2024).

After this court's June 12, 2023 decision, on August 31, 2023, the Department of Energy issued an agency class deviation regarding SAM registration (Class Deviation). The agency explained:

---

[4] On June 30, 2023, the court issued the public version of the June 12, 2023 Order.

**CLASS DEVIATION DETERMINATION AND FINDINGS FOR REVISED FEDERAL ACQUISITION REGULATION (FAR) PROVISION FOR SAM.GOV REGISTRATION**

**FINDINGS:**

1. FAR Subpart 4.11, System for Award Management, prescribes policies and procedures for requiring contractor registration in the System for Award Management (SAM) to: (a) Increase visibility of vendor sources (including their geographical locations) for specific supplies and services; and (b) Establish a common source of vendor data for the Government. FAR 4.1102, Policy, requires Offerors and quoters to be registered in SAM at the time an offer or quotation is submitted in order to comply with the annual representations and certifications requirements (with certain exceptions referenced in FAR 4.1102(a)).

2. FAR 4.1105(a)(1) directs the insertion of such provision in FAR 52.204-7, System for Award Management, in all solicitations, unless certain exceptions apply.

3. FAR 52.204-7 was revised in 2018. The 2016 version of FAR 52.204-7(b)(1) provided that by submission of an offer, the Offeror acknowledges the requirement that a prospective awardee shall be registered in the SAM database prior to award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from the solicitation.

4. The 2018 revised FAR 52.204-7(b)(1) provides that an Offeror is required to be registered in SAM when submitting an offer or quotation and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from the solicitation.

5. FAR 52.204-7, System for Award Management, as revised during 2018, does not prescribe an outcome for failing to comply with SAM continuous registration requirement until the time of award.

6. To ensure the efficiency of the procurement system through this Class Deviation, the SAM continuous registration requirement is removed from FAR 52.204-7. The Contracting Officer will have the authority to make a reasonable determination in documenting the validity of SAM registrations at the time of offer or quotation submission and at the time of award. This alleviates any need to ensure compliance with the text stating, "continue to be registered until award".

(capitalization and emphasis in original). The Department of Energy's Class Deviation continued:

**DEVIATION LANGUAGE: (Note: _emphasis added for changes_)**

**52.204-7 System for Award Management.**

As prescribed in [FAR] 4.1105(a)(1), use the following provision:

SYSTEM FOR AWARD MANAGEMENT (AUG 2023) (DEVIATION)

(a) Definitions. As used in this provision—
"Electronic Funds Transfer (EFT) indicator means a four-character suffix to the unique entity identifier. The suffix is assigned at the discretion of the commercial, nonprofit, or Government entity to establish additional System for Award Management records for identifying alternative EFT accounts (see subpart 32.11) for the same entity.
*Registered in the System for Award Management (SAM)* means that–(1) The Offeror has entered all mandatory information, including the unique entity identifier and the EFT indicator, if applicable, the Commercial and Government Entity (CAGE) code, as well as data required by the Federal Funding Accountability and Transparency Act of 2006 (see subpart 4.14) into SAM
(2) The offeror has completed the Core, Assertions, and Representations and Certifications, and Points of Contact sections of the registration in SAM;
(3) The Government has validated all mandatory data fields, to include validation of the Taxpayer Identification Number (TIN) with the Internal Revenue Service (IRS). The offeror will be required to provide consent for TIN validation to the Government as a part of the SAM registration process; and
(4) The Government has marked the record "Active".
*Unique entity identifier* means a number or other identifier used to identify a specific commercial, nonprofit, or Government entity. See www.sam.gov for the designated entity for establishing unique entity identifiers.

(b)(1) An Offeror is required to be registered in SAM when submitting an offer or quotation, ~~*and shall continue to be registered until*~~ *at the* time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation. ***A failure to register in SAM or a lapse in SAMs registration may be treated by the Contracting Officer as a correctable matter of responsibility.***
(2) The Offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "Unique Entity Identifier" followed by the unique entity identifier that identifies the Offeror's name and address exactly as stated in the offer. The Offeror also shall enter its EFT indicator, if applicable. The unique entity identifier will be used by the Contracting Officer to verify that the Offeror is registered in the SAM.

(c) If the Offeror does not have a unique entity identifier, it should contact the entity designated at www.sam.gov for establishment of the unique entity identifier directly to obtain one. The Offeror should be prepared to provide the following information:

(1) Company legal business name.
(2) Tradestyle, doing business, or other name by which your entity is commonly recognized.
(3) Company physical street address, city, state, and Zip Code.
(4) Company mailing address, city, state and Zip Code (if separate from physical).
(5) Company telephone number.
(6) Date the company was started.
(7) Number of employees at your location.
(8) Chief executive officer/key manager.
(9) Line of business (industry).
(10) Company headquarters name and address (reporting relationship within your entity).

(d) Processing time should be taken into consideration when registering. Offerors who are not registered in SAM should consider applying for registration immediately upon receipt of this solicitation. See https://ww.sam.gov for information on registration.

(capitalization, emphasis, and strikethrough in original; alteration added). The agency concluded:

**DETERMINATION:**

Based upon the findings, I hereby determine that SAM registration requirements pursuant to FAR 52.204-7, System for Award Management, are in need of revision for DOE procurements. This class deviation is effective upon the date of signature and remains in effect indefinitely or until there are further changes to the provision at FAR 52.204-7.

(capitalization and emphasis in original).[5]

On October 5, 2023, the agency issued a sixth amendment to the Solicitation, Request for Proposal No. DE-SOL-89303321REM000084, implementing a Class Deviation to FAR 52.204-7 with the language directly above. The Department of Energy's Class Deviation was the sole change in Amendment 6, as the agency noted: "All other sections of the Final RFP remain unchanged."

Previously, on September 25, 2023, the Contracting Officer issued to both offerors a "**NOTICE OF CORRECTIVE ACTION RE-OPENING OF DISCUSSIONS UNDER SOLICITATION NO. 89303321REM000084 – HANFORD INTEGRATED TANK DISPOSITION CONTRACT (ITDC)**." (capitalization and emphasis in original). The Notice from the Contracting Officer provided:

---

[5] The agency Class Deviation reflects that the Class Deviation was approved by "John R. Bashista, Director, Office of Acquisition Management Department of Energy."

The Department of Energy (DOE) has determined it will conduct a corrective action related to the subject procurement. Pursuant to the ruling by the Court of Federal Claims, DOE reassessed the procurement, including consideration of both proposals. The solicitation stated that the Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. I have determined that additional discussions are necessary to be held with those offerors in the competitive range in accordance with FAR 15.306(d) in order to maximize the Government's ability to obtain the best value based on the requirements and the evaluation criteria set forth in the solicitation.

(footnote omitted). For each offeror, the agency requested the offeror confirm that "SAM.gov registration is current, accurate, and complete." The agency also requested:

**II. Volume II Areas of Discussion – Factor 1**

**A. <u>Key Personnel Commitment.</u>**
Submit revised Key Personnel commitment letters consistent with the RFP requirements to reflect the Final Proposal Revision submittal date for this requirement.

**III. Volume II Areas of Discussion – Factor 2**
Please confirm Attachments L-5 ["List of Contracts Terminated for Default, Cure Notices, and Conditional Payment of Fee/Profit/Other Incentive Actions"] and L-8 ["List of DOE Contracts"] are current, accurate, and complete.

**IV. Volume II Areas of Discussion – Factor 3**
No discussion items identified.

**V. Volume III Cost and Fee/Profit**

**A. <u>Price Evaluation</u>**
Please confirm all pricing elements, including fee, and confirm they are still valid for the revised proposal acceptance period.

(capitalization and emphasis in original; alterations added).

On October 23, 2023, both protestor and intervenor submitted revised proposals. After the agency issued the Class Deviation took corrective action, and issued Amendment 6 to the Solicitation, protestor HTDA filed an agency level protest on October 10, 2023 challenging the corrective action. On November 7, 2023, the agency issued a decision concluding "HTDA's October 10, 2023, agency-level protest regarding Amendment 0006 to the Hanford Integrated Tank Disposition Contract, Proposal No. DE-SOL-89303321REM000084 is hereby dismissed." Protestor HTDA also filed a protest at

the United States Government Accountability Office (GAO), on October 27, 2023, challenging the corrective action. On December 21, 2023, the GAO, noting the then-pending appeal to the United States Court of Appeals for the Federal Circuit determined: "H2C's appeal directly concerns the propriety of the procurement and could render any decision by our Office academic because a favorable decision from the Federal Circuit could allow the agency to simply abandon the deviation," and dismissed the protest.

For protestor HTDA's revised price proposal, the protestor explained a change in its calculation for Fully Burdened Labor Rates. Protestor stated:

We determined the ITDC labor costs for August 1, 2023 through July 31, 2024 using the labor rates provided by DOE in Attachment L-6f for union labor rates, since the union labor rates are based on historical rates for the ITDC scope of work and are consistent with the bargaining agreements provided by the RFP. [redacted] HTDA labor rates [redacted] and are consistent with the terms and conditions of the solicitation, applicable laws, including the wage rate requirements in accordance with the bargaining agreements, Service Contract Labor Standards, Clause H.4 Workforce Transition and Employee Hiring Preferences Including through Period of Performance, and Clause H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (Oct 2017) (Revised). DOE provided estimated direct productive labor hours (DPLH) for each skill as part of the RFP in Attachment L-6b. HTDA considers the labor costs to be reasonable and realistic for the hours provided.

(capitalization in original). The protestor's price proposal continued: [redacted]

The revised proposals were evaluated by the Source Evaluation Board which issued a Source Evaluation Board Report on February 21, 2024. In the February 21, 2024 Source Evaluation Board Report, the Source Evaluation Board evaluated both protestor's proposal and intervenor's proposal. Regarding protestor's revised price proposal, the Source Evaluation Board stated:

**SEB [Source Evaluation Board] Evaluation:**

Based on the SEB's evaluation, HTDA's [protestor's] costs and fees are reasonable (Key Personnel and Fully Burdened Labor Rates), realistic (Transition) and in alignment with RFP [Solicitation] requirements.

Transition – The SEB reviewed the proposed Transition costs and resources, and performed a cost and technical review, resulting in a determination that the proposed resources/costs are realistic. The SEB's evaluation consisted of a review of the proposed direct labor hours, skill mixes and other direct costs determining the proposed resources were sufficient to complete the deliverables and other necessary transition activities within the proposed schedule. The associated cost evaluation reviewed supporting documentation contained within the proposal relating

to base labor rates, indirect rates, and other direct costs unit costs to determine the information was realistic. The requirement for an Independent Government Cost Estimate was waived for this procurement.

Key Personnel – The SEB reviewed the proposed Key Personnel compensation supporting documentation and obtained input from the Environmental Management Consolidated Business Center's Contractor Human Resources Specialist, resulting in a determination that the proposed costs are reasonable and are within Section M.5's required limitation of $568,000.

Fully Burdened Labor Rates – The SEB reviewed the proposed Fully Burdened Labor Rates reconciling the proposed base labor and indirect rates to the solicitation information (HTDA did not propose any additional indirect rates) and performed a mathematical verification when applying the fully burdened labor rates to provided labor hours. The SEB determined the proposed fully burdened labor rates based on the FY 2021 historical direct labor rates escalated to February 2023 are reasonable.

The SEB negatively questioned the IDIQ Fully Burdened Labor Rates and therefore made a cost adjustment (increased cost) of $58,903,360. Section L-17(b)(5) states the base labor rates are historical FY 2021 escalated to February 1, 2023, and provided for informational purposes. Offerors were not required to use the historical base rate information provided, however in accordance with Section H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017)(Revised) Paragraph (e)(1)(i) Pay states "*The Contractor shall provide equivalent base pay to Incumbent Employees as compared to the base pay provided by the Incumbent Contractors, and reimbursed by the government, for at least the first year of the term of the Contract*".

HTDA provided [redacted] surveys from [redacted] and an explanation of the computation and rationale. However, HTDA did not provide information as to how the [redacted] surveys considered the highly skilled and specialized workforce at the Hanford site that is needed to perform contractual tasks at a nuclear facility and how the [redacted] survey would be in compliance with the H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017) (Revised) requirement. Therefore, the SEB increased the proposed cost using the historical base labor rates information provided in the solicitation.

Fee – The purposed fee is mathematically accurate and within the RFP required guidelines.

(capitalization and emphasis in original; alterations added).

Regarding intervenor H2C's revised price proposal, the Source Evaluation Board stated:

**SEB Evaluation:**

Based on the SEB's evaluation, H2C's [intervenor's] costs and fees are reasonable (Key Personnel and Fully Burdened Labor Rates), realistic (Transition) and in alignment with RFP [Solicitation] requirements.

Transition –The SEB reviewed the proposed Transition costs and resources performing a cost and technical review, resulting in a determination the proposed resources/costs are realistic. The SEB's evaluation consisted of a review of the proposed direct labor hours, skill mixes, and other direct costs determining the proposed resources were sufficient to complete the deliverables and other necessary transition activities within the proposed schedule. The associated cost evaluation reviewed supporting documentation contained within the proposal relating to base labor rates, indirect rates, and other direct costs unit costs to determine the information was realistic. The requirement for an Independent Government Cost Estimate was waived for this procurement.

Key Personnel – The SEB reviewed the proposed Key Personnel compensation supporting documentation and obtained input from the Environmental Management Consolidated Business Center's Contractor Human Resources Specialist, resulting in a determination that the proposed costs are reasonable and are within RFP Section M.5 required limitation of $568,000.

Fully Burdened Labor Rates – The SEB reviewed the proposed Fully Burdened Labor Rates reconciling the proposed base labor and indirect rates to the solicitation information (H2C did not propose any additional indirect rates) and performed a mathematical verification when applying the fully burdened labor rates to provided labor hours.

Fee – The proposed fee is mathematically accurate and within the RFP required guidelines.

(capitalization and emphasis in original; alteration added).

On February 24, 2024, after review of the Source Evaluation Board Report prepared by the Source Evaluation Board, the Source Selection Authority issued a Source Selection Decision Document. The Source Selection Authority's February 24, 2024 Source Selection Decision Document began:

This document summarizes the Hanford Integrated Tank Disposition Contract (ITDC) acquisition process, the results of the evaluation conducted

16

by the Source Evaluation Board (SEB), and my selection decision as the Source Selection Authority (SSA) based on my independent judgment.  In response to the solicitation, two proposals were received.  The Offerors are the Hanford Tank Waste Operations & Closure, LLC (H2C) [intervenor] and the Hanford Tank Disposition Alliance (HTDA) [protestor].  A competitive range was established that included both Offerors and both Offerors submitted Final Proposal Revisions (FPRs).  No changes were made to the SEB's Technical & Management Evaluation Factor adjectival ratings, which are summarized in Table 1.  The Offerors' proposed costs and fee are summarized below in Table 2.

**Table 1.  Summary of Technical and Management Proposal Evaluation Results**

| Vol. II - Technical & Management Evaluation Factors* | H2C [Intervenor] | HTDA [Protestor] |
|---|---|---|
| Key Personnel | Outstanding | Outstanding |
| Past Performance | Good | Good |
| Management Approach | Good | Good |

(capitalization and emphasis in original; alterations added). For price, the Source Selection Authority's Source Selection Decision Document included the following table:

**Table 2.  Summary of Cost and Fee/Profit Proposal Evaluation Results**

| Vol. III - Cost and Fee/Profit Evaluation | | |
|---|---|---|
| **Proposed** | **H2C [Intervenor]** | **HTDA [Protestor]** |
| Total Proposed Transition Cost | $[redacted] | $[redacted] |
| Total Proposed Key Personnel Cost | $[redacted] | $[redacted] |
| Total Proposed Labor Cost** | $532,737,367 | $473,834,006 |
| Total Proposed Fee/Profit | $[redacted] | $[redacted] |
| **Total Proposed Price** | **$629,863,486** | **$559,574,265** |
| **Evaluated** | | |
| Probable Cost Adjustment | - | $58,903,361 |
| **Total Evaluated Price** | **$629,863,486** | **$618,477,626** |

** Labor costs are for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours

(capitalization and emphasis in original; alterations added). The Source Selection Authority continued:

I agree with the SEB's evaluation of the proposals, overall adjectival ratings, and most of the evaluated significant strengths, strengths, weaknesses, and areas found to be neither strengths nor weaknesses. I also considered the SEB's overall evaluation of the Cost and Fee/Profit proposals in determining the best value to the Government. Their evaluation was thorough, and it effectively presents the positive and negative attributes of the proposals. I considered the SEB's evaluation, and the information provided by the Offerors, and developed a comparative assessment to determine the superior Offeror for this contract. Based on the evaluation conducted by the SEB, my review of the proposals, my discussions with the SEB, and my independent review and judgment, I select H2C for the award of the Hanford ITDC acquisition, as its proposal represents the best value to the Government.

The Source Selection Authority stated:

The SEB evaluated the proposals against the RFP requirements, the stated evaluation factors contained in Section M of the RFP, and applicable regulations contained in FAR Part 15 and Department of Energy Acquisition Regulation (DEAR) Part 915. The Technical and Management proposals received adjectival ratings for each technical evaluation factor in accordance with the Source Selection Plan. All proposals were evaluated fairly and impartially.

The Source Selection Authority explained:

On August 31, 2023, DOE approved a new class deviation to the requirements of FAR 52.204-7 with revised language that states, "An Offeror is required to be registered in SAM when submitting an offer or quotation, at the time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation. A failure to register in SAM or a lapse in SAMs registration may be treated by the Contracting Officer as a correctable matter of responsibility."

On September 25, 2023, DOE issued a Notice of Corrective Action of Discussions under Solicitation No. 89303321REM000084 – Hanford ITDC to both Offerors. The discussion items included a Draft Amendment 0006 that incorporated the FAR 52.204-7 System for Award Management (SAM) deviation language and also requested the following discussion items from each Offeror: Confirmation that the SAM registration is current, accurate, and complete; Submission of revised Key Personnel commitment letters consistent with the RFP requirements to reflect the Final Proposal Revision submittal date for this requirement; Confirmation that Attachments L-5 and L-8 are current, accurate, and complete; and Confirmation that all pricing elements, including fee, and confirmation they are still valid for the revised

proposal acceptance period. The discussions entailed written correspondence only.

In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority provided an analysis of each of the evaluation factors. For the Key Personnel evaluation factor, the Source Selection Authority determined:

**Factor 1 – Key Personnel – SSA Assessment Summary**

I considered the SEB's evaluation of the Key Personnel proposed by each Offeror, the information provided by the Offerors in their proposals, and information I obtained from attending the Key Personnel interviews. . . . [T]he SEB evaluated both H2C and HTDA as Outstanding. I reviewed and considered the substance and nature of the Significant Strength and Strength ratings. I agree with the SEB's evaluation and overall adjectival ratings assigned to the two Offerors for Factor 1, however, I find clear discriminators between the Offerors' proposed required and non-required Key Personnel, as to demonstrated leadership and experience in current and previous positions that are very similar and similar to their proposed positions. I find that although analogous ratings were assigned, there are clear discriminators that provide me with more or less confidence in suitability for the proposed position and likelihood of success. I find discriminators in favor of H2C relative to HTDA. Based on my comparative assessment, the H2C proposal demonstrates a very high probability of successful contract performance, exhibits very limited risk and is clearly more advantageous than the HTDA proposal for this factor. As discussed below, the H2C Operations Manager and [redacted] clearly provide more depth and breadth in qualifications and similar experience to ITDC. The H2C Operations Manager and equally qualified Program Manager, provide me with significant confidence in leading this new critical mission change from DFLAW [Direct Feed Low-Activity Waste] construction to 24/7 operations. As noted below, I view both Program Managers as equally suitable, however I have less confidence in the HTDA Operations Manager, as discussed below. Moreover, the H2C proposed [redacted] brings significant diverse experience from different DOE and commercial sites that will be invaluable in safety culture and pivoting from construction to 24/7/365 operations.

**I find that overall, for Factor 1, Key Personnel, H2C is the superior Offeror over HTDA. Factor 1, the most important technical evaluation factor, is a major discriminator and results in a significant advantage for H2C over HTDA.**

(capitalization and emphasis in original; alterations and omission added). After comparing each of the key personnel for each offeror, the Source Selection Authority determined:

Overall, in my assessment, H2C offered the better Operations Manager and [redacted] and offered a unique function of [redacted]. The SEB evaluated each of these three H2C positions as a Significant Strength. I agree with the SEB. As stated above, I found both PMs equally suitable for the Program Manager position. Per Section M.2 of the solicitation, the PM [Program Manager] and Operations Manager are considered the most important aspects of the evaluation of key personnel and of <u>equal importance</u>. Therefore, I found a clear advantage of the H2C proposed key personnel team over the HTDA proposed key personnel team.

**I find that overall, for Factor 1, Key Personnel, H2C is the superior Offeror over HTDA. Factor 1 is a major discriminator and results in a significant advantage for H2C over HTDA.**

(capitalization and all emphasis in original; alteration added). For the Past Performance evaluation factor, the Source Selection Authority determined:

**Factor 2 – Past Performance – SSA Comparative Analysis**

I considered the SEB's evaluation of Past Performance for each Offeror, and I agree with the SEB's adjectival rating of Good for both H2C and HTDA. When I consider the work to be performed, I find that both Offerors have the capability to perform the Hanford ITDC PWS requirements and have a number of Very Relevant and Relevant contracts with positive past performance information that support an expectation of good performance and customer satisfaction with limited risk. Both companies bring past performance from very similar and similar DOE projects with HLW [High-Level Radioactive Waste] treatment, tank farm and operations at (Hanford, SRS [Savannah Rover Site], and Idaho). Both companies have successfully performed on the very similar SRS liquid waste program that the SEB evaluated as a Significant Strength. In addition, both companies bring commercial past performance. This includes the chemical industry past performance on the H2C team, which I found as a positive attribute. The teaming subcontractor past performance is additionally beneficial to the government. I also considered the negative Past Performance information evaluated. Both Offerors received a Good adjectival rating because the positive past performance information outweighs the negative past performance information. Consequently, I do not find discriminators between H2C and HTDA in the Past Performance evaluation factor.

**I find that overall, for Factor 2, Past Performance H2C and HTDA have comparable past performance and there is no discriminator or advantage.**

(capitalization and emphasis in original; alterations added).

For the Management Approach evaluation factor, the Source Selection Authority explained:

**Factor 3 – Management Approach – SEB Evaluations and SSA Determinations**

Factor 3, *Management Approach* includes three elements:
(a) Contract Transition Approach.
(b) Management Approach.
I Small Business Participation.
The following Table 7 provides a summary of the SEB's evaluation for Factor 3, including the SEB's adjectival ratings from the SEB Report. Both H2C and HTDA demonstrated a good understanding of the contract requirements, and an effective approach to perform the work that results in a high probability of successful contract performance with a likelihood that performance objectives will be exceeded. This resulted in an adjectival rating of Good. Each of the Significant Strengths/Strengths are further supported in detail within the SEB Report.

Table 7.  Management Approach Evaluation Results

| Offeror | Significant Strengths | Strengths | Weaknesses | Significant Weaknesses | Deficiencies | Adjectival Rating |
|---|---|---|---|---|---|---|
| H2C [intervenor] | 0 | 3 | 0 | 0 | 0 | Good |
| HTDA [protestor] | 1 | 2 | 0 | 0 | 0 | Good |

(capitalization and emphasis in original; alterations added). The Source Selection Authority then determined:

**Overall Management Approach Comparative Analysis**

H2C received three Strengths: one for its contract transition approach, one for its small business contracting, and one for its management approach. HTDA received one Significant Strength for its management approach, one strength for small business subcontracting participation, and one strength for contract transition approach. I found both teams had a strong transition approach but H2C had a slight advantage because they proposed [redacted]. I find that the [redacted] provides me with a higher confidence in successful transition approach and contract performance, which gives a slight advantage to H2C for their transition approach. I found both teams are equal in small business participation, and I have confidence in both.

For Management Approach, although the SEB evaluated HTDA's Management Approach as a Significant Strength and H2C's as a Strength,

I would have given H2C a Significant Strength because of the [redacted]. I found that there is slight advantage in favor of H2C because they proposed a more comprehensive integrated commercial safety approach, and [redacted]. This represents the essence of end-state contracting in clearly defined scopes of work with associated risk reduction and fiscal environmental liability retirement.

. . .

The SEB rated both H2C and HTDA as Good. Considering the nature of the Significant Strengths and Strengths assigned to each Offeror and applicability to overall contract performance, I find Factor 3 to be a discriminator for H2C over HTDA.

**I find that overall, for Factor 3, Management Approach, H2C is the superior Offeror over HTDA. Factor 3 is a discriminator and results in a slight advantage for H2C over HTDA.**

(capitalization and emphasis in original; omission added). For Price, the Source Selection Authority explained:

**SSA's Comparative Assessment of Evaluated Price**

The SEB Report provided a detailed analysis and evaluation of the Offeror's [sic] Volume III cost and fee/profit proposals. For purposes of determining the best value, the evaluated price includes the total of the proposed fee/profit (all fee/profit proposed by Task Order type) for a 1-year period (not exceeding the identified fee limitations), proposed costs for Key Personnel (up to the compensation limits), proposed costs for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours (Offeror's additional proposed direct labor categories included in L-6g were not used to compute the evaluated price for award purposes), and realistic costs for the Transition Task Order period.

I reviewed the SEB's analysis and find that it was complete and thorough. I also reviewed the cost and fee/profit evaluation. I reviewed the SEB's analysis of technical and cost adjustments (none) and agree with its evaluations. Table 8 provides a summary of the SEB Cost/Price Evaluation Results. Table 9 provides a summary of the proposed fee/profit percentages that each Offeror proposed for each task order type. I agree with the SEB's adjustments and probable cost, and total evaluated price assigned to each Offeror.

*Table 8. Cost/Price Evaluation Results*

| Volume III Cost & Fee/Price Evaluation | H2C [Intervenor] | HTDA [Protestor] |
|---|---|---|
| Transition Cost | $[redacted] | $[redacted] |
| Key Personnel Cost | $[redacted] | $[redacted] |
| Labor Cost | $532,737,367 | $473,834,006 |
| Fee/Profit | $[redacted] | $[redacted] |
| Total Proposed Price | **$629,863,486** | **$559,574,265** |
| Cost Adjustments | $0 | $58,903,361 |
| Total Evaluated Price | **$629,863,486** | **$618,477,626** |

Table 9. Proposed Fee and Profit Percentages

| Task Order Type | H2C | HTDA |
|---|---|---|
| Cost Plus Award Fee (CPAF) | [redacted]% | [redacted]% |
| Cost Plus Incentive Fee (CPIF) | [redacted]% | [redacted]% |
| Cost Plus Fixed Fee (CPFF) | [redacted]% | [redacted]% |
| Firm Fixed Price (FFP) | [redacted]% | [redacted]% |
|  |  |  |

Overall, I find the SEB did a thorough analysis of each of the proposals, and that the costs reflect an accurate depiction of the costs that the Government could be expected to pay. Although both proposals have the same adjectival ratings and H2C's evaluated price is slightly higher than HTDA's evaluated price, I find that H2C clearly presents the best value to the government.

H2C submitted a clearly superior proposal with "Outstanding" Key Personnel, the best Operations Manager and [redacted]. H2C offered [redacted]. In addition, H2C offered [redacted]. The superior Key Personnel and slightly more advantageous Management Approach will not only achieve contract requirements but will likely exceed performance expectations significantly. Finally, I find significant value in H2C's transition approach with [redacted]. I find the technical advantages associated with the H2C proposal outweigh the $11,385,860 (less than 2%) in price difference. Overall, H2C represents a better value than HTDA and therefore, I find the difference in price between HTDA and H2C to be de minimis overall and the value of obtaining a superior Key Personnel team, [redacted], and a more advantageous Management Approach, to be worth the price premium.

Furthermore, even though I agree with the cost adjustment for HTDA, I believe the price premium is also justified without the cost adjustment (or as proposed). Without the cost adjustment, the proposed prices represent a difference of approximately 12%, or $70,289,221. I also would not consider this price premium to be disproportionate to the benefits associated with the higher technical merit included in the H2C proposal when compared to the HTDA proposal for the reasons cited above. The critical importance of the work scope will take on an even greater role during this contract period as the site moves to 24-hour operations for waste processing. The price difference is not significant in relation to the total site budget (more than $2B annual site budget), and the contractor is responsible for providing task waste operations and processing services that are vital to advancing the cleanup mission at Hanford. Greater certainty in performance by the ITDC contractor would also justify a price premium of approximately 12%, regardless of the cost adjustment.

(capitalization and emphasis in original; alterations added). The February 24, 2024 Source Selection Decision Document concluded:

**Summary SSA's Comparative Assessment**

I agree with the SEB's technical and management evaluation as documented in the final SEB Report and summarized below in Table 10. My summary comparative assessment for each
evaluation factor is as follows:

- For Factor 1, Key Personnel, I find that overall H2C provides a significant advantage over HTDA. Factor 1 is a major discriminator and results in a significant advantage for H2C over HTDA.
- For Factor 2, Past Performance, I find H2C and HTDA have comparable past performance and there is no discriminator or advantage.
- For Factor 3, Management Approach, I find that overall H2C is the superior Offeror over HTDA. Factor 3 is a discriminator and results in a slight advantage for H2C over HTDA.

Table 10. SEB and SSA Technical/Management and Price Evaluation Results

| Technical and Management Evaluation Factors & Evaluated Price (Width of Cell Represents Importance of Factor) | | H2C [Intervenor] | HTDA [Protestor] |
|---|---|---|---|
| 1 | Key Personnel | | |
| | SEB Evaluation | Outstanding | Outstanding |
| | SSA Determination – **Major Discriminator** | Significant Advantage over HTDA | |
| 2 | Past Performance | | |
| | SEB Evaluation | Good | Good |
| | SSA Determination – **Not a Discriminator** | Equal | Equal |
| 3 | Management Approach | | |
| | SEB Evaluation | Good | Good |
| | SSA Determination – **Discriminator** | Slight Advantage over HTDA | |
| Total Evaluated Price | | **$629,863,486** | **$618,477,626** |

(capitalization and emphasis in original; alterations added). In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority determined:

> Based on the evaluation conducted by the SEB and my independent review and judgment, I select H2C for award of a contract for the Hanford ITDC acquisition. The proposal submitted by H2C represents the best value to the Government, since I identified advantages in their technical proposal over the technical proposal of HTDA that are worth the price premium associated with that proposal.

After evaluation, on February 29, 2024, the agency again awarded the contract to intervenor. Subsequently, on March 21, 2024, protestor filed another bid protest complaint

in the United States Court of Federal Claims, Case No. 24-440C, also assigned to the undersigned.

Protestor's complaint in the protest currently under review, Case No. 24-440C, again argues, as protestor did in the first protest in Case No. 23-683C, that "H2C [intervenor] is ineligible for award because it allowed its System for Award Management ('SAM') registration to lapse, in violation of the mandatory requirements of FAR 52.204-7," which protestor argues, "requires offerors to remain continuously registered in SAM as a condition of award. H2C's failure to maintain its SAM registration is incurable and renders its proposal ineligible for award." (alteration added). Protestor also argues that

> during corrective action the DOE amended the Solicitation to improperly replace FAR 52.204-7 with a new class deviation, FAR 52.204-7 System of Award Management (AUG 2023) (Deviation), that permits award to offerors that fail to maintain an active SAM registration. The DOE's amendment is improper because (1) the sole purpose of the amendment is to rehabilitate H2C's incurably ineligible proposal following the Court of Federal Claims' decision that H2C was ineligible for award, (2) federal law requires the deviation to pass through ordinary notice-and-comment rulemaking before the DOE can begin inserting it into solicitations, and (3) the deviation is impermissibly retroactive.

> Regarding the agency's evaluation, protestor also contends that

> DOE deviated from the Solicitation by evaluating cost realism beyond HTDA's transition cost proposal and applying an upward probable cost adjustment of $58.9 million to HTDA's proposal for its fully burdened direct labor costs for Fiscal Year 2023. With the probable cost adjustment, HTDA's total evaluated price for the first year of performance (including transition) was $11 million less than H2C's total evaluated price and approximately $111 million less over the contract's ten-year ordering period. ***When the probable cost adjustment is removed, HTDA's price advantage over H2C increases to $70 million for just the first year of performance and at least $600 million over the life of the ten-year ordering period (and nearly $1 billion if the DOE were to award a five-year task order just before the ten-year ordering period closes).***

(capitalization and emphasis in original). Finally, protestor argues that "the DOE conducted a flawed best value tradeoff, irrationally concluding that H2C's proposal offered the best value based on an unreasonable evaluation and comparison of the H2C and HTDA proposals."

After protestor filed its current bid protest complaint, Case No. 24-440C, the court held a hearing with the parties and issued a scheduling Order. The parties' fully briefed cross-motions for judgment on the Administrative Record, with the defendant and intervenor additionally making arguments to dismiss some of protestor's claims. Protestor

claims that "H2C is still ineligible for award because of its lapsed SAM registration" and "[t]he DOE's Solicitation Amendment replacing FAR 52.204-7 with a new Class Deviation is improper." (alteration added). Protestor also argues that the "DOE conducted an improper Cost Realism assessment," and, as a result, the "DOE's Best Value Tradeoff and Source Selection Decision are unreasonable." In response, defendant argues

> HTDA first contends that H2C is ineligible for award due to its lapse in SAM registration, which occurred entirely before the HTDA I [Case No. 23-683C] protest. Res judicata bars this line of argument and HTDA has waived it by not appealing from the HTDA I judgment, issued after HTDA made the same argument regarding the exact same SAM registration lapse. The Court addressed and rejected the same argument in HTDA I, allowing H2C to remain eligible for award, and HTDA was required to preserve its rights by appealing. Further, neither party's SAM registration lapsed between submission of final proposal revisions on October 23, 2023, and contract award on February 29, 2024. And, even if the operative date for proposal submission under the SAM clause were the date of some earlier, invalid, proposal, the contracting officer merely applied the mandatory class deviation as written. Thus, even had H2C been ineligible for award before amendment 06 implemented the SAM deviation, that amendment cured the previous lapse, as well as any deficiencies in HTDA's sam.gov registration.

Defendant also suggests that the challenges to the Class Deviation are improper.

> Regarding the agency's evaluation of the revised proposals, defendant argues

> DOE's price reasonableness analysis was entirely reasonable under FAR 15.402(a), which explicitly allows cost realism analyses to assess price reasonableness. HTDA's proposed labor rates were patently unrealistic and HTDA failed to establish any connection between its rates from a want ad website and actual pay for incumbent workers on the tank operation contract. Additionally, the Source Selection Authority conducted a best value analysis using both HTDA's proposed and adjusted prices and found that H2C was the best value, so HTDA cannot establish any harm from the adjustment.

(emphasis in original).

Intervenor, H2C, argues that "[t]his Court should deny all of HTDA's SAM-Registration claims because H2C's FPR [Final Proposal Revisions] complied with FAR 52.204-7." Intervenor separately argues the court should dismiss protestor's claim that the agency did not properly issue its FAR 52.204-7 class deviation as "outside of the Court's jurisdiction." (alterations added). Regarding the agency's evaluation of the two revised proposals, intervenor also argues that protestor's "cost realism arguments fail" because "HTDA's purported cost savings are illusory and were properly recognized as such by DOE." Also, according to intervenor, protestor's "best value challenge fails"

because "HTDA merely disagrees with the SSA's judgment, which is insufficient to render the award decision arbitrary and capricious." After the motions were fully briefed the court held oral argument. Due to the urgency, as represented by the United States to the court, and, as indicated above, the court issued an oral decision to the parties. This Opinion memorializes the oral decision provided to the parties.

## DISCUSSION

Res Judicata

Initially, the court addresses defendant's contention that for protestor's argument the intervenor "must be held ineligible for award because of its pre-final proposal revision lapse in SAM registration. Res judicata bars this argument." According to defendant, protestor's argument was addressed in protestor's first bid protest, Case No. 23-683C, previously filed and dismissed by this court. See generally Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489. In a footnote to its reply brief, intervenor states: "H2C agrees with the Government that HTDA's SAM claim is barred by res judicata. HTDA already asked this Court to hold that H2C is incurably unawardable due to the lapse in SAM registration. HTDA should not get a second chance to raise the same argument." Protestor simply responds "res judicata does not apply."

The doctrine of res judicata "includes the two related concepts of claim preclusion and issue preclusion." Nasolak Coating Corp. v. Nylok Corp., 522 F.3d 1320, 1323 (Fed. Cir. 2008). As articulated by the United States Supreme Court, the rule of issue preclusion, or collateral estoppel, precludes a party from re-litigating an issue that was "litigated and resolved in a valid court determination essential to the prior judgment." New Hampshire v. Maine, 532 U.S. 742, 748-49, reh'g denied, 533 U.S. 968 (2001). In addition, "[u]nder the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." United States v. Mendoza, 464 U.S. 154, 158 (1984) (alteration added); see also Allen v. McCurry, 449 U.S. 90, 94 (1980) ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."). "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 443 (1970). The United States Supreme Court has explained that issue preclusion guards against "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153–54 (1979) (footnote omitted). The Supreme Court also held:

Issue preclusion bars successive litigation of "an issue of fact or law" that "is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment." Restatement (Second) of Judgments § 27 (1980) (hereinafter Restatement). If a judgment does not depend on a given determination, relitigation of that determination is not precluded. Id., § 27, Comment h.

Bobby v. Bies, 556 U.S. 825, 834 (2009) (alteration in original); see also United States v. Mendoza, 464 U.S. at 158 ("Collateral estoppel, like the related doctrine of res judicata, serves to 'relieve parties of the cost and vexation of multiple law-suits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)).

The United States Court of Appeals for the Federal Circuit has set out four guidelines for determining whether issue preclusion is appropriate:

> Issue preclusion bars a cause of action when four conditions are met: "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the first action."

Laguna Hermosa Corp. v. United States, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (quoting In re Freeman, 30 F.3d 1459, 1465 (Fed. Cir. 1994); see also Biafora v. United States, 773 F.3d 1326, 1333 (Fed. Cir. 2014); Angel v. United States, 172 Fed. Cl. 102, 116 (2024) (quoting Laguna Hermosa Corp. v. United States, 671 F.3d at 1288); Crowley Gov't Servs., Inc. v. United States, 171 Fed. Cl. 453, 462 (2024); Cully Corp. v. United States, 160 Fed. Cl. 360, 373, recons. denied, 163 Fed. Cl. 676 (2022), recons. denied, 165 Fed. Cl. 737 (2023), appeal dismissed, No. 2023-2006, 2023 WL 5038823 (Fed. Cir. Aug. 8, 2023).

For its res judicata argument, defendant contends:

> The parties are the same. There was an earlier final judgment in HTDA I [Hanford Tank Disposition All., LLC v. United States, No. 23-683C]. And HTDA notes that the 2024 award stems from the same procurement as the 2023 award. In HTDA I, HTDA explicitly asked the Court to hold that H2C was ineligible for award and requested an order "permanently enjoining the DOE from any re-award of the Contract to H2C under the current Solicitation [or alternatively] remand . . . with explicit instructions that H2C is ineligible for award . . . and that the Agency may not re-award the Contract to H2C under the current Solicitation." HTDA I Op. [Hanford Tank Disposition All., LLC v. United States, No. 23-683C, 2023 WL 5167489,] at 3.

(omissions and second alteration in defendant's brief). Protestor responds:

> In the present protest [Case No. 24-440C], HTDA's Complaint challenges DOE's ability to cure H2C's lapsed SAM registration and requests a judgment that the award was improper. HTDA has alleged not only that H2C's lapsed SAM registration renders it ineligible for award, but also that DOE's attempt to cure that defect through a suspect class deviation is improper. HTDA's present cause of action thus is unequivocally different from its predecessor.

(internal references omitted; alteration added).

In protestor's bid protest complaint in the earlier protest, Case No. 23-683C, protestor alleged in count six: "H2C [intervenor] does not appear to be registered in SAM [System for Award Management], which is the official registry for federal offerors and contractors. Under most competed procurements (including this one) other than very low-value contracts, failure to have been registered in SAM at the time of proposal submission precludes award to an offeror," and "[a]s of this [May 8, 2023] date, an entity search in SAM for Hanford Tank Waste Operations & Closure LLC does not return any results, among either the active or inactive SAM profiles." (alterations added). Protestor argued in the earlier protest, Case No. 23-683C, that "[t]his suggests H2C was not registered in SAM at the time it submitted its proposal for this competition and/or did not maintain continual registration until time of [the original] award, in violation of FAR 52.204-7." (alterations added). In count three of the current bid protest complaint in Case No. 24-440C, protestor argues, related to the FAR 52.204-7 issue, that "DOE's Solicitation Amendment replacing FAR 52.204-7 with a New Class Deviation is improper." Additionally, in count one in Case No. 24-440C, protestor alleges, regarding the protestor's revised price proposal submitted after the corrective action, the agency's

> evaluation of HTDA's cost proposal – and the resulting $58.9 million upward most probable cost adjustment – were contrary to the RFP and unreasonable. Had the Agency rationally evaluated cost realism, it would have limited the evaluation to transition costs and not made any probable cost adjustment to HTDA's proposed costs. But for these errors, HTDA would have had an even greater cost/price advantage in this closely contested best value procurement, and it would have received the contract award.

Furthermore, related to protestor's allegations in count one, in count four in the current bid protest complaint, protestor alleges:

> DOE's best value source selection decision is flawed because of the numerous prejudicial errors described above and evident in DOE's evaluation materials. In particular, had the Agency rationally evaluated cost realism in accordance with the Solicitation, it would have limited the evaluation to transition costs and concluded that no probable cost adjustment to HTDA's proposal was appropriate. When the $58.9 million probable cost adjustment is removed, HTDA's price advantage over H2C increases from $11 million to $70 million. Based on this substantial cost/price advantage and the identical evaluation ratings assigned to the offerors, HTDA would have had a substantial likelihood of contract award as the offeror presenting the best value to the Government.

The allegations in count one, count three, and count four of protestor's complaint in Case No. 24-440C were arguments that were not included in protestor's complaint in the previous bid protest, Case No. 23-683C.

Protestor also quotes <u>Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.</u>, 590 U.S. 405, for the proposition that "<u>res</u> judicata 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" (quoting <u>Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.</u>, 590 U.S. at 414). The Supreme Court in <u>Lucky Brand</u> explained:

> Claim preclusion generally "does not bar claims that are predicated on events that postdate the filing of the initial complaint." <u>Whole Woman's Health v. Hellerstedt</u>, [579 U.S. 582, 600,] 136 S. Ct. 2292, 2305, 195 L. Ed. 2d 665 (2016) (internal quotation marks omitted); <u>Lawlor v. National Screen Service Corp.</u>, 349 U.S. 322, 327–328, 75 S. Ct. 865, 99 L. Ed. 1122 (1955) (holding that two suits were not "based on the same cause of action," because "[t]he conduct presently complained of was all subsequent to" the prior judgment and it "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). This is for good reason: Events that occur after the plaintiff files suit often give rise to new "[m]aterial operative facts" that "in themselves, or taken in conjunction with the antecedent facts," create a new claim to relief. Restatement (Second) § 24, Comment *f*, at 203; 18 J. Moore, D. Coquillette, G. Joseph, G. Vairo, & C. Varner, Federal Practice § 131.22[1], p. 131–55, n. 1 (3d ed. 2019) (citing cases where "[n]ew facts create[d a] new claim").

<u>Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.</u>, 590 U.S. at 414–15 (first two alterations added). As described above, a number of protestor's allegations and claims arise from the agency's decision to issue a Class Deviation for FAR 52.204-7 on August 31, 2023, which took place after the court's earlier June 12, 2023 decision finding "intervenor's proposal did not comply with FAR 52.204-7(b)(1), which was a mandatory requirement in the procurement at issue in this protest." <u>Hanford Tank Disposition All., LLC v. United States</u>, 2023 WL 5167489, at *3. The Department of Energy's Class Deviation, issued after the prior bid protest in Case No. 23-683C was dismissed, changed the nature of some of the claims and arguments made by protestor in the current bid protest, Case No. 24-440C, and resulted in new issues and arguments by protestor which were not at issue or made in the prior bid protest, Case No. 23-683C. <u>Res</u> judicata, therefore, does not bar protestor's claims in the present bid protest, Case No. 24-440C.

<u>Waiver</u>

Defendant also argues "HTDA waived its contention that H2C must forever be ineligible for award" "by failing to appeal from the <u>HTDA I</u> judgment."[6] Defendant cites to

---

[6] As described above, intervenor appealed the court's June 12 ,2023 decision in the first protest brought by protestor, Case No. 23-683C, but ultimately dismissed the appeal. <u>See</u> <u>Hanford Tank Disposition All., LLC v. United States</u>, 2024 WL 3085479.

the court's June 12 ,2023 decision in the first protest brought by protestor, Case No. 23-683C, in which the court explained:

> In order to discuss all the SAM issues before the court, the court held another hearing with the parties on May 30, 2023. At the hearing, the court ordered all parties to file submissions with the court to address, in writing, all the SAM issues regarding both protestor and intervenor.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *2. The court continued, noting that protestor

> respectfully requests that the Court issue a permanent injunction, based on Plaintiff's [sic] noncompliance with FAR 52.204-7, vacating the Department of Energy's ("DOE" or "Agency") award of the Hanford Integrated Tank Disposition Contract ("the Contract" or "ITDC") to Defendant-Intervenor Hanford Tank Waste Operations & Closure, LLC ("H2C"), and permanently enjoining the DOE from any re-award of the Contract to H2C under the current Solicitation. In the alternative, Plaintiff [sic] requests that the Court remand the case to the DOE with explicit instructions that H2C is ineligible for award based on its noncompliance with FAR 52.204-7 and that the Agency may not re-award the Contract to H2C under the current Solicitation or allow H2C to perform the illegally awarded Contract.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *2 (alterations in original). Defendant, in the bid protest currently before the court, argues:

> The Court rejected HTDA's requests, envisioning that DOE could award the contract to either HTDA, H2C or some other contractor, directing that DOE "should reassess the procurement, including consideration of the intervenor's proposal and the protestor's proposal." Id. at 4 [Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *4]. HTDA did not appeal or cross-appeal and, thus, HTDA I's rejection of HTDA's arguments became final.

(alteration added). Protestor responds that protestor has not "waived its right to challenge H2C's continued eligibility for award by not appealing the Court's judgment in HTDA I, because the Court never issued a final judgment on the merits that could be appealed on that issue." Protestor also contends:

> According to the Government, although the Court **declared the award to H2C improper**, the relief the Court provided reflected an adverse decision on the merits that HTDA was obliged to appeal in order to challenge DOE's subsequent attempt to cure H2C's defective proposal. Of course, the Court did not "reject" HTDA's allegation that H2C's ineligibility was incurable. It simply never reached the issue because that issue was not before the Court and DOE had neither taken corrective action nor attempted to cure H2C's defective proposal at the time of the judgement.

(emphasis in original).

In the court's June 12, 2023 Order in the earlier bid protest, Case No. 23-683C, the court concluded:

> After holding multiple hearings with the parties regarding the SAM issues and careful review of the parties' written submissions, the court finds intervenor's proposal did not comply with FAR 52.204-7(b)(1), which was a mandatory requirement in the procurement at issue in this protest. Therefore, the award to intervenor was improper and the award is set aside, and performance of the contract is enjoined.
>
> After review of this court's determination, the agency should reassess the procurement, including consideration of the intervenor's proposal and the protestor's proposal. If either protestor or intervenor disagree with the actions of the agency's reconsideration of how to proceed, or wish to challenge a subsequent award regarding the work contemplated by Request for Proposal No. DE-SOL-89303321REM000084, either protestor or intervenor may file a bid protest in this court'. . . . As determined above, performance of intervenor '2C's contract is **ENJOINED**. The above captioned protest is **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this Order.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *3 (capitalization and emphasis in original; omission added). The court finds that the court's June 12, 2023 Order was a decision in favor of protestor, granting protestor's original claim in count six in its earlier complaint in Case No. 23-683C that intervenor was not registered in SAM during the pendency of the earlier procurement challenge, and that intervenor "did not maintain continual registration until time of award, in violation of FAR 52.204-7." (alterations added). The court, in its June 12, 2023 decision, instructed the agency to "reassess the procurement, including consideration of the intervenor's proposal and the protestor's proposal." Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *3. The agency reviewed the court's decision, took corrective action on September 25, 2023, issued the Class Deviation on August 31, 2023, and then on October 5, 2023, the agency issued a sixth amendment to the Solicitation which replaced FAR 52.204-7 with the Class Deviation language. Defendant's arguments regarding res judicata and wavier fail.

Cross-Motions for Judgment on the Administrative Record in Case No. 24-440C

Regarding the parties' arguments in the cross-motions for judgment on the Administrative Record, as indicated by the United States Court of Appeals for the Federal Circuit:

> Cross-motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims. "In

deciding these motions, the [Claims Court] considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'"

XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (alteration in original) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)));see also DigiFlight, Inc. v. United States, 165 Fed. Cl. 588, 598 (2023); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); AAR Mfg., Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CeleraPro, LLC v. United States, 168 Fed. Cl. 408, 425 (2023); CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1343 (Fed. Cir. 2021); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district

courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir.) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), <u>reh'g denied</u> (Fed. Cir. 2004); <u>DigiFlight, Inc. v. United States</u>, 165 Fed. Cl. at 597. In <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" <u>Id.</u> at 1351 (alteration added) (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>see also</u> <u>Mitchco Int'l, Inc. v. United States</u>, 26 F.4th 1373, 1377 (Fed. Cir. 2022); <u>Harmonia Holdings Grp., LLC v. United States</u>, 999 F.3d 1397, 1403 (Fed. Cir. 2021); <u>Palantir USG, Inc. v. United States</u>, 904 F.3d at 990; <u>AgustaWestland North Am., Inc. v. United States</u>, 880 F.3d 1326, 1332 (Fed. Cir. 2018); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir.), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). <u>See</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350-51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057–58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[7] <u>see also</u> <u>REV, LLC v.</u>

---

[7] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>   (B) contrary to constitutional right, power, privilege, or immunity;
>   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

United States, 91 F.4th 1156, 1163 (Fed. Cir. 2024); Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021); Veterans Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Per Aarsleff A/S v. United States, 829 F.3d at 1309; Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (first alteration added) (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334,

---

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.


In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Off. Design Grp. v. United States, 951 F.3d 1366, 1371 (Fed. Cir. 2020); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (alteration added) (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. 720, 732 (2022).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

[W]e will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (alteration added) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ." (alteration added)); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007) (alterations added). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). """If the

37

court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"" <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1371 (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); <u>Limco Airepair, Inc. v. United States</u>, 130 Fed. Cl. 544, 550 (2017) (citation omitted).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) (internal citations omitted), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977); <u>see also</u> <u>U.S. Postal Serv. v. Gregory</u>, 534 U.S. 1, 6-7 (2001); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974), <u>reh'g denied</u>, 420 U.S. 956 (1975); <u>DynCorp Int'l, LLC v. United States</u>, 10 F.4th 1300, 1315 (Fed. Cir. 2021) ("Review in bid protests under the arbitrary-and-capricious standard is 'highly deferential.' Under it, we must 'sustain an agency action evincing rational reasoning and consideration of relevant factors.'" (internal citations omitted)); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, the Federal Circuit stated "'the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" (quoting <u>Tex. Crushed Stone Co. v. United States</u>, 35 F.3d 1535, 1540 (Fed. Cir. 1994))); <u>In re Sang Su Lee</u>, 277 F.3d at 1342; <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. at 285)); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 959 (Fed. Cir. 1993); <u>Sys. Studies & Simulation, Inc. v. United States</u>, 146 Fed. Cl. 186, 199 (2019); <u>By Light Prof'l IT Servs., Inc. v. United States</u>, 131 Fed. Cl. 358, 366 (2017); <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. 753, 755, <u>recons. denied</u>, 60 Fed. Cl. 251 (2004); and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381)), <u>appeal dismissed</u>, 559 F. App'x 1033 (Fed. Cir. 2014); <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 382; <u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. 224, 231 (2012); <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014) (alteration added); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations.").

Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Agile Def., Inc. v. United States, 959 F.3d 1379, 1385 (Fed. Cir. 2020) ("As we have repeatedly recognized, '[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 (alteration, internal quotation marks, and citation omitted in original))); AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we

sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); see also Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th at 997; DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1310–11 (Fed. Cir. 2021). "Accordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (internal quotation marks omitted)).

When a contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion"; "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Cleveland Assets, LLC v. United States, 883 F.3d 1378, 1382 (Fed. Cir. 2018) ("The arbitrary and capricious standard of review is 'highly deferential,' and procurement officials 'have a great deal of discretion' in their decisions, particularly when, as here, 'the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.'") (quoting Croman Corp. v. United States, 724 F.3d at 1363); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958.

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys.

Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (alteration and omission added) (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A Bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (20113. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error." (alteration added)); see also Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021); Off. Design Grp. v. United States, 951 F.3d at 1371; Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award–that it was within the zone of active

41

consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999) (alteration in original); see also WellPoint Mil. Care Corp. v. United States, 953 F.3d 1373, 1382 (Fed. Cir. 2020) ("[T]he mere possibility of harm is insufficient to rise to the level of prejudicial error. We have held that the appropriate standard is that the bid protestor must allege a 'significant error' that affected the award decision." (alteration added) (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1368; Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

SAM Registration

Initially, protestor argues that "H2C [intervenor] is ineligible for award based on its lapsed SAM registration," arguing that "[t]he threshold question in this protest [Case No. 24-440C] is whether H2C is eligible for its most recent award notwithstanding its unexcused SAM registration lapse during this procurement." (alterations added). Protestor contends "H2C's proposal is ineligible for award after corrective action for the same reason it was ineligible for award before corrective action: between August 13, 2022 and January 24, 2023, H2C failed to remain registered in SAM, in violation of FAR 52.204-7." Protestor also argues that "[t]hrough Amendment 6, the DOE has attempted to move the goal posts of this competition by retroactively applying a deviation to save H2C's proposal from the offeror's own unexcused noncompliance with a legitimate and mandatory requirement," and that "[t]he DOE's Solicitation Amendment replacing FAR 52.204-7 with a new Class Deviation is improper." (alterations added). The language of the Class Deviation for FAR 52.204-7(b)(1) changed the requirement to:

> An Offeror is required to be registered in SAM when submitting an offer or quotation, *and shall continue to be registered until* at the time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation. ***A failure to register in SAM or a lapse in SAMs registration may be treated by the Contracting Officer as a correctable matter of responsibility.***

(capitalization, emphasis, and strikethrough in original).

Prior to the Class Deviation, FAR 52.204-7(b)(1) stated: "An Offeror is required to be registered in SAM when submitting an offer or quotation, and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation." FAR 52.204-7(b)(1). In the court's June 12, 2023 decision in Case No. 23-683C, the court determined that intervenor was registered in SAM when intervenor submitted its initial proposal on January 6, 2022, and again when the agency

made the award to intervenor on April 13, 2023, but its registration had lapsed during the intervening period. See Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *1. The court, therefore, concluded after "careful review of the parties' written submissions, the court finds intervenor's proposal did not comply with FAR 52.204-7(b)(1), which was a mandatory requirement in the procurement at issue in this protest." Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *3.

Protestor again argues before this court, in Case No. 24-440C, that "H2C's proposal is ineligible for award after corrective action for the same reason it was ineligible for award before corrective action: between August 13, 2022 and January 24, 2023, H2C failed to remain registered in SAM, in violation of FAR 52.204-7." Protestor alleges that "failure to remain registered in SAM continually from initial proposal submission until contract award renders a proposal ineligible for award." The court notes that there is no argument that either protestor's SAM registration or intervenor's SAM registration lapsed between submission of the final revised proposals on October 23, 2023, and contract award to intervenor on February 29, 2024.

Protestor suggests "[b]ecause a noncompliant offeror cannot go back in time and retroactively make itself compliant with FAR 52.204-7, discussions are of no use to a noncompliant offeror like H2C" and that "[n]ew discussions and proposal revisions did not, and cannot, cure H2C's noncompliance." (alterations added). Referencing Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. 224 (2023), protestor contends "[a]s Judge Dietz recently held, discussions and proposal revisions cannot cure a failure to be registered in SAM, unless the offeror uses the discussions to prove the agency was factually mistaken about the offeror's past failure to be registered." (alteration added).

In Thalle/Nicholson Joint Venture v. United States, Judge Dietz of the United States Court of Federal Claims explained

> [o]n August 19, 2021, USACE [United States Army Corps of Engineers] issued a solicitation for the repair and modification of a spillway at the Lewisville Dam in Denton County, Texas. The solicitation called for an unrestricted competition which would result in the award of a firm-fixed-price construction contract with an estimated cost of "$63M including escalation and contingencies.

Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. at 227 (alterations added; internal reference and footnote omitted). Judge Dietz continued:

> Thalle/Nicholson submitted its proposal on November 3, 2021. Thalle/Nicholson's proposal identified "Thalle-Nicholson Joint Venture" as the offeror. The proposal was signed by representatives of Thalle Construction Co., Inc. and Nicholson Construction Co., the two entities comprising the joint venture, and it included a copy of the joint venture agreement. With respect to SAM registration, the proposal stated that "[e]ach JV member has completed representations and certifications in SAM," and included individual proof of SAM registration for Thalle Construction Co., Inc. and Nicholson Construction Co. USACE received

proposals from Thalle/Nicholson, Shimmick, and Kiewit Infrastructure South Co. ("Kiewit"). Initially, USACE found all three proposals unacceptable. In its consensus evaluation worksheet, USACE described deficiencies as "all areas where the contractor fails to meet minimum requirements of the solicitation." With respect to Thalle/Nicholson's proposal, USACE identified deficiencies in relation to several non-price evaluation factors. None of the deficiencies identified in USACE's initial evaluation concerned SAM registration. See id.

On December 1, 2021, USAGE issued Evaluation Notices to all three offerors. In the notice provided to Thalle/Nicholson, USACE stated that "[w]e are now in discussions[,]" and informed Thalle/Nicholson of the deficiencies identified in the initial evaluation report. Once more, USACE did not mention any deficiencies related to SAM registration. See id. The Evaluation Notice provided an opportunity for Thalle/Nicholson "to review and revise [its] technical proposal and [its] price proposal if [it] believes it is necessary[.]" Thalle/Nicholson submitted a response to the Evaluation Notice on December 22, 2021.

Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. at 228–29 (alterations in original; internal references omitted). Judge Dietz explained that the Thalle/Nicholson Joint Venture protestor argued

that its "failure to be registered in SAM at the time it submitted its proposal cannot form the rational basis of USACE's determination that Thalle/Nicholson was ineligible for award." Thalle/Nicholson asserts that registration in SAM is a responsibility determination, and that "[a]gencies are not required to make a responsibility determination until the time of award and an offeror is entitled to the opportunity to provide missing responsibility information up until that time." Thalle/Nicholson also argues that USACE failed to conduct meaningful discussions by not raising Thalle/Nicholson's SAM registration as a deficiency and allowing Thalle/Nicholson to correct it. Lastly Thalle/Nicholson argues that USACE failed to document its award decision.

Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. at 232 (internal references omitted). In his analysis, Judge Dietz determined:

Thalle/Nicholson's arguments are unpersuasive. The record shows that USACE reasonably determined that Thalle/Nicholson's proposal was ineligible for award because the Thalle/Nicholson joint venture was not registered in SAM at the time of proposal submission, as required by the plain language of FAR 52.204-7. "When the text is unambiguous, the court need only read the plain language of the regulation." Goodwill Indus. of S. Fla., Inc. vs. United States, 162 Fed. Cl. 160, 192 (2022). The solicitation incorporated FAR 52.204-7 by reference. As noted above, FAR 52.204-

7(b)(1) unambiguously requires that an offeror be registered in SAM "when submitting an offer" and that an offeror "continue to be registered until the time of award." This requirement applies to all "Offerors[,]" including joint venture offerors, and it cannot be satisfied using the individual SAM registrations of the joint venture members. See G4S Secure Integration LLC v. United States ("G4S I"), 2022 WL 211023 at *6-7 (2022) ("in revising FAR 52.204-7 in 2018, the FAR Council specifically considered whether to exempt joint ventures from being registered in SAM at the time they submitted offers to RFPs and rejected this notion."). Here, the solicitation expressly states that offerors are "required to meet all solicitation requirements, including terms and conditions, representations and certifications, and technical requirements . . . [and] [f]ailure to meet a requirement may result in an offer being ineligible for award." (emphasis added). Thalle/Nicholson concedes that it was not registered in SAM at the time it submitted its proposal on November 3, 2021. Accordingly, because Thalle/Nicholson was not in compliance with the SAM registration requirements in FAR 52.204-7(b)(1), USACE had a rational basis for determining that Thalle/Nicholson's proposal was ineligible for award. See CGS-ASP Sec., JV, LLC v. United States, 162 Fed. Cl. 783, 814 (2022).

Further, the Court is not persuaded by Thalle/Nicholson's attempts to avoid application of the SAM registration requirements in FAR 52.204-7(b)(1). According to Thalle/Nicholson, "SAM registration relates to responsibility, not responsiveness[,]" and an offeror's responsibility "is determined, not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time." However, it is not necessary for the Court to determine whether SAM registration is a matter of responsibility or responsiveness. Based on the plain language of FAR 52.204-7(b)(1), an offeror's compliance with the SAM registration requirements is necessarily determined based on the offeror's SAM registration status at the time of offer submission. See 52.204-7(b)(1) ("An Offeror is required to be registered in SAM when submitting an offer or quotation. . .") (emphasis added). If an offeror is not registered in SAM when it submits its offer, a determination that the offeror is non-compliant is unavoidable. Even if the Court were to adopt Thalle/Nicholson's position that SAM registration is a matter of responsibility that may be addressed at any time prior to contract award, the only remedy for non-compliance with the SAM registration requirements of FAR 52.204-7(b)(1), as it is written, would be for the offeror to provide information that demonstrates it was registered in SAM when it submitted its offer and that it continued to be registered up until the time of award. In the instant case, USACE presented Thalle/Nicholson with such an opportunity, and Thalle/Nicholson was unable to demonstrate that it was registered in SAM as required by FAR 52.204-7(b)(1).

The Court is similarly unpersuaded by Thalle/Nicholson's arguments regarding the government's failure to raise the issue of its SAM registration status during their discussions. Thalle/Nicholson contends that "[w]hen USACE decided to include Thalle/Nicholson in the competitive range, USACE obligated itself to conduct full and meaningful discussions with Thalle/Nicholson" in accordance with FAR 15.306(d) and that USACE failed to do so because it failed to identify Thalle/Nicholson's SAM registration status as a deficiency. Thalle/Nicholson suggests that "USACE could have allowed Thalle/Nicholson to correct the SAM registration issue during the course of discussions." However, even if the Court were to conclude that USACE was obligated by FAR 15.306(d) to bring Thalle/Nicholson's SAM registration status to its attention during discussions, Thalle/Nicholson still would not be able to demonstrate that it was prejudiced by USACE's failure. See Precision Asset Mgmt. Corp. v. United States, 135 Fed. Cl. 342, 355 (2017) ("Although the court has concluded that defendant violated FAR 15.306(d)(3) by failing to engage in meaningful discussions with plaintiff, in order to be actionable, that violation must also have been prejudicial." (citing Impresa [Construzioni Geom. Domenico Garufi v. United States], 238 F.3d at 1333)). Since Thalle/Nicholson was not registered in SAM when it submitted its proposal and, therefore, did not possess information to demonstrate that it was compliant with the SAM registration requirements in FAR 52.204-7(b)(1), Thalle/Nicholson would not have been able to remedy the non-compliance such that it would be eligible for contract award. G4S II, 161 Fed. Cl. at 417-18 (finding no prejudice for misleading discussions when a joint venture failed to meet the requirements of FAR 52.204-7(b)(1) because the joint venture offeror could not rectify the mistake).

Furthermore, if USACE had allowed Thalle/Nicholson to remain in the competition by registering in SAM after it submitted its proposal, this action would have constituted a waiver of the requirement in FAR 52.204-7(b)(1) that an offeror be registered in SAM when submitting an offer. The Court is not aware of any legal basis on which USACE could have waived this requirement. The plain language of FAR 52.204-7(b)(1) does not provide the contracting officer with any discretion to determine at what point an offeror must be registered in SAM. See FAR 52.204- 7(b)(1) ("An Offeror is required to be registered in SAM when submitting an offer or quotation, and shall continue to be registered until time of award, . . ."). As the Court explained in G4S I, allowing the contracting officer to waive the requirements of FAR 52.204-7(b)(1) would disregard the 2018 amendment that removed any discretion by the contracting officers to determine the timing of SAM registration and "would allow an agency to waive a FAR provision with mandatory language without pursuing the FAR's mandatory procedures when agencies seek to deviate from the FAR". See G4S I, 2022 WL 211023, at *7-*9.

Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. at 232–34 (omissions in original; last alteration added; internal references and footnotes omitted).

Similarly, in Myriddian, LLC v. United States, 165 Fed. Cl. 650 (2023), Judge Tapp of the United States Court of Federal Claims considered the requirements of FAR 52.204-7(b)(1) for a solicitation with the Department of Health and Human Services, Centers for Medicare & Medicaid Services. By way of background, Judge Tapp stated:

> The procurement at issue involves an 8(a) small business set-aside firm-fixed price contract. The Solicitation provided for a one-year base period of contract performance with three one-year option periods, a ten-month option period, and a three-month transition out period. The Solicitation stated the Agency would make a best value trade-off decision in accordance with FAR Part 15. The Solicitation required all offerors to comply with its term and conditions to be deemed eligible for the award. Specifically, it provided that "[i]f an Offeror fails to meet the solicitation requirements, including the submission of applicable contract documentation, the Government will not make an award to that Offeror." The Solicitation also explicitly incorporated by reference FAR 52.204-7, a provision addressing System for Award Management ("SAM"). FAR 52.204-7(b)(1) provides that "[a]n Offeror is required to be registered in SAM when submitting an offer or quotation, and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation." On November 21, 2022, offerors submitted their proposals. The Agency fully evaluated a total of six proposals and determined that Cloud Harbor's proposal provided the best value trade-off and was eligible for award. On March 9, 2023, the Agency formalized its decision and awarded the contract to Cloud Harbor. Myriddian protested the decision before this Court on March 30, 2023.

Myriddian, LLC v. United States, 165 Fed. Cl. at 654 (alterations and omissions in original; internal references and footnotes omitted). In his analysis, Judge Tapp explained:

> Myriddian argues that Cloud Harbor was ineligible for award because it failed to comply with FAR 52.204-7(b)(1) when its SAM registration lapsed. The United States does not contest that Cloud Harbor's registration lapsed but claims that the lapse does not make it ineligible for award. This issue is resolved by resorting to the Solicitation language.

> The Solicitation explicitly incorporated FAR 52.204-7. "When interpreting regulations, we apply the same interpretive rules we use when analyzing the language of a statute." Boeing Co. v. Sec'y of Air Force, 983 F.3d 1321, 1327 (Fed. Cir. 2020) (citing Mass. Mut. Life Ins. Co. v. United States, 782 F.3d 1354, 1365 (Fed. Cir. 2015)). Therefore, the Court's analysis begins and ends with the plain and ordinary meaning of the provision. Jimenez v.

Quarterman, 555 U.S. 113, 118, 129 S. Ct. 681, 172 L. Ed. 2d 475 (2009); Banknote Corp. of Am.[, Inc. v. United States], 365 F.3d at 1353. The Court must, wherever possible, "giv[e] effect to the plain meaning of each word, clause or sentence." ManTech Telecomm. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001) (internal citations omitted).

First, the Court analyzes whether FAR 52.204-7(b)(1) is mandatory. FAR 52.204-7(b)(1) provides: "An Offeror is <u>required</u> to be registered in SAM when submitting an offer or quotation, and <u>shall</u> continue to be registered . . . ." (emphasis added). When a contractor is "required to" perform a task, it imposes a compulsory constraint. See H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343-44 (Fed. Cir. 1998). Further, it is well-established that "shall" "generally imposes a nondiscretionary duty" and "connotes a requirement." Supernus Pharms., Inc. v. Iancu, 913 F.3d 1351, 1359 (Fed. Cir. 2019) (internal citations omitted). Therefore, registration in SAM is mandatory under FAR 52.204-7(b)(1).

Next the Court turns to the operative phrase in FAR 52.204-7(b)(1), "shall continue to be registered until time of award . . . ." When regulatory terms are undefined, the Court gives them their ordinary meaning. See Nicely v. United States, 23 F.4th 1364, 1369 (Fed. Cir. 2022) (internal citations omitted) (interpreting statutory language). Merriam-Webster defines "continue" as "to maintain without interruption a condition, course, or action." Continue, Merriam-Webster, https://www.merriam-webster.com/dictionary/continue (last visited May 8, 2023). It follows that an offeror's SAM registration may not have an interruption or lapse under the plain meaning of FAR 52.204-7.

This interpretation is critical because Cloud Harbor's registration lapsed from February 12 to March 1. This seventeen-day period fell between November 21, 2022, when Cloud Harbor submitted its proposal and March 9, 2023, when the Government made its award decision. Myriddian argues the regulation "unambiguously requires that an offeror be registered in SAM when submitting an offer and that an offeror continue to be registered until the time of award." The Court agrees with Myriddian. Accordingly, Cloud Harbor violated the plain language of FAR 52.204-7 because it failed to "continue to be registered until time of award[.]"

Myriddian argues such a lapse is fatal because Cloud Harbor did not comply with a mandatory Solicitation requirement. Myriddian highlights the Solicitation's "Eligibility for Award" clause which provided that "[i]n order to be eligible for award, Offerors are required to comply with the terms and conditions of the solicitation . . . If an Offeror fails to meet the solicitation requirements, including the submission of applicable contract documentation, the Government will not make an award to that Offeror." Consequently, failure to comply with FAR 52.204-7, which was incorporated

into the Solicitation, rendered Cloud Harbor ineligible for the award. Regarding Cloud Harbor's ineligibility, the United States argues the lapse was not fatal because Cloud Harbor was registered when it submitted its bid and when the Agency issued the award, so the error was correctable. However, this is a distinction without a difference under the stark language of the FAR where offerors "shall continue to be registered until time of award[.]" FAR 52.204-7(b)(1).

It would be nonsensical to carve out an exception for FAR 52.204-7's continuity requirement. The United States fails to distinguish the harms arising from a failure to be registered in SAM when an offer is submitted or when the Agency issues an award—both of which the United States seems to believe are fatal—from the harm arising from a failure to be continuously registered as required by FAR 52.204-7(b)(1). Likewise, the Court declines to draw a distinction based on the duration of the registration lapse. Just as the FAR does not account for any number of days delay in registration at the time an offeror submits its bid or following the agency's award decision, the FAR does not permit such unrestrained agency discretion. FAR 52.204-7. Such discretion would disqualify some offerors altogether while disregarding the avoidable blunders of others.

Further, Myriddian argues the Agency does not have the authority to waive the registration requirement because the plain language of FAR 52.204-7(b)(1) is unambiguous. In support, Myriddian cites G4S Secure Integration LLC v. United States, where the Court determined contracting officers ("COs") lack discretion "as to when to require SAM registration" under FAR 52.204-7. No. 21-1817, 2022 WL 211023 at *5 (Fed. Cl. Jan. 24, 2022). In G4S Secure Integration LLC, the Court analyzed the current version of FAR 52.204-7 which prohibits agency discretion regarding SAM registration and even instructs offerors to take processing time into consideration when registering in SAM. 2022 WL 211023 at *5-8. The Court is persuaded by this analysis and finds that the Agency lacks discretion to waive the FAR 52.204-7 requirement.

Myriddian, LLC v. United States, 165 Fed. Cl. at 655–57 (emphasis, alterations, and omissions in original; internal references and footnotes omitted).

As referenced in both Thalle/Nicholson Joint Venture and Myriddian, in an unpublished decision, Judge Hertling of the United States Court of Federal Claims considered FAR 52.204-7 in the context of a joint venture in G4S Secure Integration LLC v. United States, No. 21-1817C, 2022 WL 211023 (Fed. Cl. Jan. 24, 2022), appeal dismissed, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023). In G4S, Judge Hertling explained at issue was a "contract award issued by the U.S. Department of State ('State') for security services for the U.S. Embassy in Luanda," in Angola and "State contemplated awarding a time-and-materials contract for one base year and four one-

year option periods to the 'responsive responsible offeror' with the lowest priced, technically acceptable offer." Id. at *1. Judge Hertling explained:

> State received five proposals in response to the Solicitation. A Technical Evaluation Panel ("TEP") determined that one proposal was submitted late, a second was non-responsive, and a third was technically unacceptable. The TEP established a competitive range with the remaining two offerors, G4S and CGS-ORSA [a joint venture comprised of Continuity Global Solutions, LLC (CGS) and Omega Risk Solutions Angola (ORSA)], and conducted discussions with them. The TEP ultimately found both G4S's and CGS-ORSA's proposals to be technically acceptable.
>
> . . .
>
> On June 25, 2021, the State contracting officer sent a request for a pre-award survey to CGS-ORSA. The contracting officer noted that the "[s]tatus of SAM.gov DUNS 117974155 registration for CGS-ORSA Security JV, as of June 24, 2021, . . . is incomplete." The contracting officer requested that CGS-ORSA "provide[ ] the necessary documentation to ensure that the DUNS is registered in SAM.gov by July 8, 2021 1:00 PM EST." An attachment to the contracting officer's email showed that the SAM registration associated with DUNS number 117974155 was "Work in Progress," (i.e., not active) as of June 24, 2021. The attachment also identified the company name associated with DUNS number 117974155 as the name of CGS's CEO and advised that "an incorrect or incomplete Legal Business Name" had been detected during processing.
>
> CGS-ORSA promptly responded to the contracting officer that the listing "was a mistake in SAM.gov" and that it had reached out to correct the error. On July 9, 2021, CGS-ORSA emailed the State contracting officer to inform her that the DUNS and SAM registration had been updated and completed. An attachment to that email showed that DUNS number 117974155 was then assigned to "CGS-ORSA Security LLC," and the associated SAM registration was active. On August 19, the contracting officer informed CGS-ORSA that its proposal had been selected for award.

G4S Secure Integration LLC v. United States, No. 21-1817C, 2022 WL 211023, at *2–3 (first alteration added; second omission in original; internal references and footnote omitted). In his analysis, of FAR 52.204-7, Judge Hertling wrote:

> FAR 52.204-7(b)(1) (emphasis added) provides: "An Offeror is required to be registered in SAM when submitting an offer or quotation, and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this

solicitation." This provision was expressly incorporated into the solicitation, as FAR 4.1105 required.

FAR 52.204-7 was amended in 2018. "Federal Acquisition Regulation: System for Award Management Registration," 83 Fed. Reg. 48,691-01, 48,698 (Sept. 26, 2018). Prior to October 2018, offerors could register in SAM at any time prior to award. FAR 52.204-7(b)(1) (effective Oct. 31, 2016, until Oct. 25, 2018); see also Nilson Van & Storage, Inc. v. United States, 99 Fed. Cl. 408, 411 (2011). The pre-October 2018 version of FAR 52.204-7 afforded contracting officers some discretion as to when to require SAM registration. FAR 52.204-7(d) (effective from Oct. 31, 2016 until Oct. 25, 2018) provided that "[i]f the Offeror does not become registered in the SAM database in the time prescribed by the Contracting Officer, the Contracting Officer will proceed to award to the next otherwise successful registered Offeror." Since 2018, FAR 52.204-7 requires offerors to be registered in SAM when they submit an offer. The provision also no longer provides contracting officers with discretion.

G4S Secure Integration LLC v. United States, 2022 WL 211023, at *5 (alteration and emphasis in original; internal reference omitted). Judge Hertling concluded:

The offer submitted by CGS-ORSA violated FAR 52.204-7. That provision requires, among other things, the offering entity to have entered all mandatory identifying information in SAM and the profile to be marked as "active" at the time an offeror submits its offer. FAR 52.204-7(a) At the time that CGS-ORSA submitted its offer, the DUNS number it had used to attempt to register in SAM corresponded to the DUNS number for the CEO of CGS and not to CGS-ORSA itself. Accordingly, CGS-ORSA, the offeror, had not properly entered all mandatory identifying information. Additionally, at the time the offer was submitted, the government had not marked the registration as "active"; the registration was still "in progress." The requirements of FAR 52.204-7(a) therefore were not met. The defendant has conceded that the joint venture CGS-ORSA itself was not registered in SAM at the time it submitted its offer.

G4S Secure Integration LLC v. United States, 2022 WL 211023, at *6 (internal reference omitted).

Protestor also cites to a recent decision, Independent Rough Terrain Center v. United States, 172 Fed. Cl. 250 (2024), to argue "[t]he Court's decision in Independent Rough Terrain Center is directly on point and dispositive of HTDA's bid protest because it confirms that a lapsed SAM registration cannot be cured through corrective action, as the Government and Hanford Tank Waste Operations and Closure ('HTC') wrongly assert." (alteration added). In Independent Rough Terrain Center v. United States, Judge Davis of the United States Court of Federal Claims explained "[i]n December 16, 2022, AMC [United States Army Materiel Command] issued a Request for Proposals (W56HZV-

21-R-0157) ('Solicitation') for the modernization of its RTCH [Rough Terrain Container Handler] vehicles, which the Army primarily uses to lift and move shipping containers." Id. at 253 (alterations added). Judge Davis noted:

> The Solicitation's terms included mandatory eligibility requirements for each offeror, including the incorporation of the FAR's SAM registration requirement:
>
>> Section M.1.4, Eligibility for Award: Award will only be made to an offeror who is eligible for award. To be eligible for award: a. The offeror must be determined responsible [in accordance with] Section M.4; b. The proposal must not contain any Deficiencies . . . ; c. The offeror must be registered in the System for Award Management (SAM) [in accordance with] FAR 52.204-7.

Indep. Rough Terrain Ctr., LLC v. United States, 172 Fed. Cl. at 253-54 (alterations and omission in original). After the Army made the award to the intervenor, the protestor in Independent Rough Terrain Center, LLC v. United States filed suit in the United States Court of Federal Claims. See id. at 254. Judge Davis noted that, "[p]resumably in response to the present protest, the Government reviewed IRTC's SAM registration records and discovered a lapse in IRTC's registration from May 26, 2023, to August 9, 2023." Id. (alteration added). Judge Davis observed:

> The parties agree that a lapse in IRTC's [Independent Rough Terrain Center's] SAM registration occurred. IRTC, however, disputes that the lapse makes it ineligible for award. It argues that because this is not a solicitation for a FAR-based contract, FAR 52.204-7 is not applicable in the same way as in other FAR-based solicitations. Rather than imposing a stringent application of FAR 52.204-7, as would be required in a FAR Part 15 procurement, it contends AMC "is free to choose which FAR principles apply, and to what extent." Although IRTC acknowledges that the FAR's SAM registration requirement is mandatory, it argues that without the full context of the administrative record, the Court must interpret what AMC intended by including this FAR provision. IRTC posits that AMC did not intend the full scope of FAR 52.204-7 to apply here because the eligibility requirement at issue in the Solicitation does not use language that "overtly" invokes its full scope as compared with language used for other FAR provisions. According to IRTC, other solicitation provisions also show that AMC intended FAR 52.204-7 to apply only at the time of award. It highlights that each of the three eligibility requirements listed in Section M.1.4 of the Solicitation assesses the status of the offeror "immediately prior to award" and not at other times.

Indep. Rough Terrain Ctr., LLC v. United States, 172 Fed. Cl. at 260-61 (alteration added; internal references omitted). Judge Davis concluded:

> The Court is sympathetic to but unpersuaded by IRTC's arguments. The requirement for continuous SAM registration under FAR 52.204-7 is not affected by the procedural posture of this protest, especially when the full text of the provision is invoked as a mandatory eligibility requirement in the Solicitation. Moreover, judges of this court have held that FAR 52.204-7 does not allow discretion "as to when to require SAM registration," as it once allowed under an earlier version of the provision. Myriddian[, LLC v. United States], 165 Fed. Cl. at 657 (quoting G4S Secure Integration LLC v. United States, No. 21-1817, 2022 WL 211023, at *5 (Fed. Cl. Jan. 24, 2022)); see also Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. 224, 233–34 (2023) (finding that allowing the SAM registration requirement to be curable would amount to an unallowable waiver of the requirement). Although the Court recognizes that the legal effect of FAR 52.204-7 may be harsh, it is not at liberty to rewrite the regulation to accommodate IRTC's policy preferences.

Indep. Rough Terrain Ctr., LLC v. United States, 172 Fed. Cl. at 262 (internal reference omitted; alteration added).

The above analysis in all four cases is consistent with this court's June 12, 2023 decision in protestor's earlier protest in Case No. 23-683C. In the earlier June 12, 2023 decision in Case No. 23-683C, this court explained that

> on May 12, 2023, defendant, the United States, filed a notice in this court which stated, in part: "Intervenor, Hanford Tank Waste Operations & Closure, LLC's (H2C), SAM registration is insufficient to meet the requirements of the solicitation because H2C did not 'continue to be registered' at all times from the date of its initial proposal." The defendant's notice continued:

>> Specifically, H2C was registered in SAM on the dates of its initial proposal [January 6, 2022] and award [April 13, 2023], but its registration lapsed during the intervening period, from about August 13, 2022, through January 24, 2023. At the time of its final revised proposal [January 10, 2023], H2C [intervenor] informed the Department of Energy (DOE) that it had held an active SAM registration at the time of initial proposal submission but it has since expired. H2C is in the process of reactivating its SAM registration, and should have an active registration shortly. In the interim, H2C submits the section K individual Reps and Certs with this final proposal revision.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *1. In the earlier case, Case No. 23-683C, the court concluded:

After holding multiple hearings with the parties regarding the SAM issues and careful review of the parties' written submissions, the court finds intervenor's proposal did not comply with FAR 52.204-7(b)(1), which was a mandatory requirement in the procurement at issue in this protest. Therefore, the award to intervenor was improper and the award is set aside, and performance of the contract is enjoined.

Hanford Tank Disposition All., LLC v. United States, 2023 WL 5167489, at *3

The current protest before this court in Case No. 24-440C, however, presents different facts and issues from the situations in <u>Thalle/Nicholson Joint Venture</u>, <u>Myriddian</u>, <u>G4S</u>, and <u>Independent Rough Terrain Center</u>, and even the previous protest at Case No. 23-683C. In the current protest brought by protestor HTDA, after this court issued its June 12, 2023 decision and judgment was entered, closing Case No. 23-683C. After the Department of Energy took corrective action, opened discussions, and identified several issues for discussions with both offerors, both offerors were asked to, and submitted, revised proposals in which both offerors also were asked to confirm that their "SAM.gov registration is current, accurate, and complete."[8]

Defendant argues "[a]lthough the Court has held that FAR 52.204-7(b)(1) requires offerors to maintain active registration on SAM from offer through award, those decisions do not involve a situation where the validity of the initial offer had expired and been replaced by a new offer," and "HTDA does not contend that there was any lapse in H2C's SAM registration between October 23, 2023 [when the revised proposals were submitted by both offerors], and the time of award. Thus, there is no SAM infirmity under FAR 52.204-7." (alterations added). Defendant suggests:

[T]he January 10, 2023, proposal submissions, which originally constituted the "offers" that the Government could accept, were superseded by DOE's entry into discussions and request for final proposal revisions received on October 23 of that year. FAR 2.101 defines "offer" as "a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract." Thus, the earlier proposal submissions were no longer valid "offers" because the Government cannot accept them — they were superseded. Each offeror's submission of October 23, 2023, constituted the current and sole "offer" DOE could accept under FAR 2.101. DOE cannot accept earlier proposals, so the "offer" for purposes of applying FAR 52.204-7(b)(1) are the final proposal revisions. Thus, October 23, 2023, is the operative date from which offerors must be active on SAM through award, not January 10, 2023. At this point, any SAM lapse before October 23, 2023, is irrelevant because earlier offers are superseded and are not "offers" as defined by FAR 2.101.

(alteration added).

---

[8] As described above, on August 31, 2023, the Department of Energy issued the agency wide Class Deviation regarding SAM registration.

Similarly intervenor argues

> [w]hen H2C submitted its new offer during DOE's corrective action (i.e., the new final proposal revision ("FPR") H2C submitted in October 2023), its prior offer was legally extinguished. See Integrated Business Sols., Inc. v. United States, 58 Fed. Cl. 420, 427 (2003). H2C's new offer fully complied with FAR 52.204-7's registration requirements because H2C was "registered in SAM when submitting an offer" and "continue[d] to be registered until time of award" and thereafter. FAR 52.204-7(b)(1).

(first alteration added).

Defendant correctly notes that FAR 2.101 provides the following definition of an "offer:"

> Offer means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Responses to invitations for bids (sealed bidding) are offers called "bids" or "sealed bids"; responses to requests for proposals (negotiation) are offers called "proposals."

FAR 2.101; see Superior Waste Mgmt. LLC v. United States, 169 Fed. Cl. 239, 249 n.1 (2024) (quoting FAR 2.101) ("'Offer means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract.'"); STG Int'l, Inc. v. United States, 165 Fed. Cl. 577, 583 (2023) ("the FAR explains that an 'offer' is 'a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract.' FAR 2.101. That means, in other words, that a proposal is not an offer unless the government's acceptance of it would create a binding contract"); see also Silver State Land LLC v. United States, 148 Fed. Cl. 217, 236 (2020) (quoting FAR 2.101) (explaining that the FAR "supplies an instructive definition of the term 'offer.' 'Offer means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract'"); NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States, 103 Fed. Cl. 338, 356 (2012) (quoting FAR 2.101) (noting that FAR 2.101"defining offer as 'a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract' and adding that 'responses to requests for proposals (negotiation) are offers called 'proposals''" (emphasis in original)); Precision Lift, Inc. v. United States, 83 Fed. Cl. 661, 665 (2008) (citing FAR 2.101); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 99 (2006), recons. in part, 75 Fed. Cl. 406 (2007) (citing FAR 2.101).

On September 25, 2023, after the court's June 12, 2023 earlier decision in Case No. 23-683C, the Contracting Officer issued to both offerors a "**NOTICE OF CORRECTIVE ACTION RE-OPENING OF DISCUSSIONS UNDER SOLICITATION NO. 89303321REM000084 – HANFORD INTEGRATED TANK DISPOSITION CONTRACT (ITDC)**." (capitalization and emphasis in original). The Notice provided, in part:

> The Department of Energy (DOE) has determined it will conduct a corrective action related to the subject procurement. Pursuant to the ruling by the Court of Federal Claims, DOE reassessed the procurement, including consideration of both proposals. The solicitation stated that the Government

reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. I have determined that additional discussions are necessary to be held with those offerors in the competitive range in accordance with FAR 15.306(d) in order to maximize the Government's ability to obtain the best value based on the requirements and the evaluation criteria set forth in the solicitation.

(footnote omitted). During the discussions with both offerors, the agency requested each offeror confirm that "SAM.gov registration is current, accurate, and complete." In addition, the agency identified discussions on:

**II. Volume II Areas of Discussion – Factor 1**

**A. <u>Key Personnel Commitment</u>.**

Submit revised Key Personnel commitment letters consistent with the RFP requirements to reflect the Final Proposal Revision submittal date for this requirement.

**III. Volume II Areas of Discussion – Factor 2**
Please confirm Attachments L-5 ["List of Contracts Terminated for Default, Cure Notices, and Conditional Payment of Fee/Profit/Other Incentive Actions"] and L-8 ["List of DOE Contracts"] are current, accurate, and complete.

**IV. Volume II Areas of Discussion – Factor 3**
No discussion items identified.

**V. Volume III Cost and Fee/Profit**

**A. <u>Price Evaluation</u>**

Please confirm all pricing elements, including fee, and confirm they are still valid for the revised proposal acceptance period.

(capitalization and emphasis in original; alterations added).

After the agency took corrective action, on October 23, 2023, consistent with the instructions from the agency, both protestor HTDA and intervenor H2C submitted revised offers. Once the agency received the revised offers, the initial proposals by both protestor and intervenor were no longer valid. At that point, the agency needed to evaluate the protestor's revised proposal and the intervenor's revised proposal and the Source Selection Authority needed to conduct a best value trade-off analysis on the revised proposals before the agency could accept an offer and award a contract. Judges of this court have routinely determined that taking corrective action by an agency moots any challenge to the earlier evaluation and earlier award. In <u>Square One Armoring Service, Inc. v. United States</u>, 123 Fed. Cl. 309 (2015), Judge Campbell-Smith of the United States Court of Federal Claims explained that the <u>Square One</u> protestor had "not pointed to any

case, and the court is aware of none, in which the court proceeded to address on the merits a protest by an unsuccessful offeror (as opposed to the original awardee) of an agency's original evaluation of proposals after the agency had agreed to take corrective action." Id. at 325. Judge Campbell-Smith then cited to a series of cases, supporting the proposition that a protest, and by extension, the original offers to a solicitation, are moot after an agency takes corrective action, including:

> B & B [Med. Servs. Inc. v. United States], 2014 WL 3587275, at *7 (concluding that an agency's proposed corrective action—re-evaluating proposals—rendered moot an unsuccessful offeror's challenge to the original evaluation and award); Croman Corp. v. United States, 106 Fed. Cl. 198, 212–13 (2012) (similar), aff'd, 724 F.3d 1357 (Fed. Cir. 2013); Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 241, 255 (2010) (concluding that an agency's completed corrective action—amendment to the solicitation and evaluation of revised proposals—rendered moot an unsuccessful offeror's challenge to the original evaluation and award); Eskridge [Research Corp. v. United States], 92 Fed. Cl. [88,] 94 [(2010)] (concluding that an agency's proposed corrective action—re-evaluating proposals—rendered moot an unsuccessful offeror's challenge to the original evaluation and award); cf. ManTech Telecomms. & Info. Sys. Corp. v. United States (ManTech), 49 Fed. Cl. 57, 65, 72–73 (2001) (reviewing alleged improprieties in the original procurement to establish a base of reference for evaluating whether the proposed corrective action—amending the solicitation and evaluating revised proposals—was reasonable), aff'd per curiam, 30 Fed. Appx. 995 (Fed. Cir. 2002).

Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. at 325–26 (alterations added). Therefore, Judge Campbell-Smith in Square One concluded: "In light of the foregoing, plaintiff's protest as it relates to the original evaluation of proposals and award decision must be dismissed as **MOOT**." Id. at 326 (capitalization and emphasis in original). When considering corrective action, Judge Griggsby of the United States Court of Federal Claims in SOS International LLC v. United States determined:

> In this case, it is undisputed that the Army's contracting officer issued a notice of corrective action on February 18, 2016, and that this corrective action will, among other things, set aside the award to Six3, clarify the RFP's page limitation requirements and reopen the competition. These undisputed facts make clear that any challenge to the original evaluation of proposals for the ITSS Contract has been mooted by the Army's decision to take corrective action. Cf. Square One Armoring Serv., Inc., 123 Fed. Cl. at 325–26. And so, the Court must also dismiss any claim challenging the Army's initial decision to award the ITSS [Intelligence Technical Support Services] Contract to Six3 as moot.

SOS Int'l LLC v. United States, 127 Fed. Cl. 576, 589 (2016) (alteration added; internal reference omitted).

Similarly, in <u>Peraton Inc. v. United States</u>, 146 Fed. Cl. 94 (2019), Judge Campbell-Smith determined

> [a]lthough the parties dispute whether Peraton has obtained through the Air Force's revised corrective action exactly the relief it sought in Count II, the court finds that Count II is moot pursuant to the precedent of <u>Chapman Law Firm Co. v. Greenleaf Construction Co.</u>, 490 F.3d 934, 939 (Fed. Cir. 2007) ("When, during the course of litigation, it develops that the relief sought has been granted or that <u>the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed.</u>") (emphasis added). Here, there is no question that the initial corrective action is no longer in controversy, because the Air Force is pursuing an entirely different path in this procurement. Generally, when an agency undertakes corrective action that is consonant with reasonable direction from the GAO, that corrective action renders any protest of the superseded agency action moot. <u>E.g.</u>, <u>Metro. Van & Storage, Inc. v. United States</u>, 92 Fed. Cl. 232, 253-55 (2010); <u>see also</u> <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1333 (Fed. Cir. 2004) ("We agree that the complaints based on pre-corrective action events are moot where charged as a specific violation of a code or statute, but are relevant in order to establish a possible pattern of bias."); <u>Square One Armoring Serv., Inc. v. United States</u>, 123 Fed. Cl. 309, 326 (2015) (dismissing as moot a challenge to an agency's evaluation and award decision that had been superseded by corrective action). The GAO holds a similar view of corrective action, which generally acts as a superseding event rendering challenges to prior agency action moot. <u>E.g.</u>, <u>HP Enter. Servs., LLC</u>, B-413382.2, 2016 CPD ¶ 343, 2016 WL 7009947, at *3 n.3 (Comp. Gen. Nov. 30, 2016) ("Where an agency takes corrective action in response to a protest under which it reevaluates/reconsiders its prior source selection decision, we view such corrective action as superseding the prior action, rendering a protest challenging that prior action moot.") (citation omitted). The court finds that plaintiff's challenge to the Air Force's initial corrective action is moot.

<u>Peraton Inc. v. United States</u>, 146 Fed. Cl. at 100–01 (alteration added).

Although factually distinct from the facts of the bid protest currently before the court, the decision in <u>STG International, Inc. v. United States</u>, 165 Fed. Cl. 577, cited above and discussed below, also supports that only revised final offers are the proposals for an agency to properly consider under the requirements of FAR 52.204-7(b)(1). In <u>STG International</u>, "ICE [United States Immigration and Customs Enforcement] issued the current solicitation to provide medical staffing in various ICE facilities, under which it anticipated awarding five to seven indefinite delivery, indefinite quantity contracts on a best-value basis," and "[t]he proposal submission and agency evaluation process proceeded in two phases." <u>STG Int'l, Inc. v. United States</u>, 165 Fed. Cl. at 581 (alterations added). In <u>STG International</u>, Judge Bruggink of the United States Court of Federal Claims explained

> [s]hortly after Phase I proposals were submitted on October 29, 2021, the
> agency issued its advisory notice letters. Because NESW [North East South
> West Healthcare Solutions] had one of the highest rated Phase I proposals,
> the agency encouraged it to proceed to the next phase. STGi's [STG
> International] proposal, on the other hand, was not highly rated and
> therefore was not recommended to continue to Phase II. Still, both bidders
> submitted Phase II proposals. After Phase II, the agency established a
> competitive range of the highest rated offers. The agency's competitive
> range included NESW (who eventually received a contract award) but not
> STGi.

Id. at 582 (alterations added). "STGi protested its exclusion from the competitive range—
first unsuccessfully at the Government Accountability Office and then at this court," and
after the protests, the agency took corrective action, resulting in a re-evaluation of each
proposal and "the agency established a new competitive range, which this time excluded
both STGi and NESW. Although NESW received a contract award under the first
competitive range, it was now deemed ineligible for an award because it was not
registered in the System for Award Management (SAM) when it submitted its Phase I
proposal." Id. Judge Bruggink in STG International identified the requirement that

> [t]he FAR requires all offerors "to be registered in SAM when submitting an
> offer or quotation." FAR 52.204-7(b)(1). Based on this provision, the agency
> decided that all bidders needed to be registered in SAM by the end of Phase
> I, which NESW was not. NESW responds that its proposal was not an offer
> until its Phase II submission, and, for that reason, did not need to be
> registered in SAM until that time.

STG Int'l, Inc. v. United States, 165 Fed. Cl. at 582 (footnote omitted; alteration added).
Judge Bruggink concluded that

> [h]ere, the Phase I proposals were not offers because they did not include
> all the essential terms necessary to establish a binding contract. Indeed, as
> the government conceded at oral argument, the Phase I proposals could
> neither be accepted by the government nor produce a valid contract. That
> is because the Phase I proposals only addressed corporate experience,
> scenario, and capability—but not price, which was supplied during Phase
> II. Thus, because the agency's hypothetical acceptance of NESW's Phase
> I proposal would not establish a binding contract, its Phase I submission did
> not satisfy the FAR's definition of an "offer."

Id. at 583 (footnote omitted). Therefore, Judge Bruggink in STG International determined
"NESW was thus unlawfully excluded from the agency's competitive range. Its proposal
was not an offer until its Phase II submission, at which point it was properly registered in
SAM." Id. at 584 (footnote omitted). Only once the offer was before the agency in STG
International was the timing of the SAM registration under the requirements of FAR
52.204-7(b)(1) a consideration in determining if the protestor was eligible for award.

In the protest currently before this court, after the Department of Energy issued the corrective action and received new proposals, the agency could no longer evaluate the earlier submitted proposals, make a best value determination or award a contract based on those earlier submitted proposals submitted before the corrective action. Therefore, the only proposals before the agency were the October 23, 2023 revised proposals from both offerors. See Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. at 325–26. As demonstrated below, protestor's revised proposal, as submitted on October 23, 2023, was substantially changed from the protestor's original proposal, and intervenor's revised proposal offered a different price than intervenor's original proposal.

As described above, on September 25, 2023, the Contracting Officer had issued to both offerors a "**NOTICE OF CORRECTIVE ACTION RE-OPENING OF DISCUSSIONS UNDER SOLICITATION NO. 89303321REM000084 – HANFORD INTEGRATED TANK DISPOSITION CONTRACT (ITDC)**." (capitalization and emphasis in original). The Notice provided:

> The Department of Energy (DOE) has determined it will conduct a corrective action related to the subject procurement. Pursuant to the ruling by the Court of Federal Claims, DOE reassessed the procurement, including consideration of both proposals. The solicitation stated that the Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. I have determined that additional discussions are necessary to be held with those offerors in the competitive range in accordance with FAR 15.306(d) in order to maximize the Government's ability to obtain the best value based on the requirements and the evaluation criteria set forth in the solicitation.

(footnote omitted). For each offeror, the agency requested the offeror confirm that "SAM.gov registration is current, accurate, and complete." The agency also requested:

**II. Volume II Areas of Discussion – Factor 1**

**A. Key Personnel Commitment.**

Submit revised Key Personnel commitment letters consistent with the RFP requirements to reflect the Final Proposal Revision submittal date for this requirement.

**III. Volume II Areas of Discussion – Factor 2**
Please confirm Attachments L-5 and L-8 are current, accurate, and complete.

**IV. Volume II Areas of Discussion – Factor 3**
No discussion items identified.

### V. Volume III Cost and Fee/Profit

### A. <u>Price Evaluation</u>

Please confirm all pricing elements, including fee, and confirm they are still valid for the revised proposal acceptance period.

(capitalization and emphasis in original). Notably, in protestor's October 23, 2023 revised price proposal, protestor explained a change in its calculation for Fully Burdened Labor Rates.[9] Protestor stated:

> We determined the ITDC [Hanford Integrated Tank Disposition Contract] labor costs for August 1, 2023 through July 31, 2024 using the labor rates provided by DOE in Attachment L-6f for union labor rates, since the union labor rates are based on historical rates for the ITDC scope of work and are consistent with the bargaining agreements provided by the RFP. [redacted] HTDA labor rates [redacted] and are consistent with the terms and conditions of the solicitation, applicable laws, including the wage rate requirements in accordance with the bargaining agreements, Service Contract Labor Standards, Clause H.4 Workforce Transition and Employee Hiring Preferences Including through Period of Performance, and Clause H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (Oct 2017) (Revised). DOE provided estimated direct productive labor hours (DPLH) for each skill as part of the RFP in Attachment L-6b. HTDA considers the labor costs to be reasonable and realistic for the hours provided.

(capitalization in original; alteration added). The protestor's revised price proposal continued: [redacted]

As reflected in the Source Selection Authority's February 24, 2024 Source Selection Decision Document challenged by protestor in Case No. 24-440C:

**_Table 1.  Summary of Technical and Management Proposal Evaluation Results_**

| Vol. –I - Technical & Management Evaluation Factors* | H2C [Intervenor] | HTDA [Protestor] |
|---|---|---|
| Key Personnel | Outstanding | Outstanding |
| Past Performance | Good | Good |
| Management Approach | Good | Good |

---

[9] Intervenor H2C's proposed price in the revised price proposal was lower than the proposed price in intervenor's initial price proposal. Intervenor did not identify a change to its calculation for Fully Burdened Labor Rates

Regarding the revised price proposals, the Source Selection Authority's February 24, 2024 Source Selection Decision Document reflected:

***Table 2.  Summary of Cost and Fee/Profit Proposal Evaluation Results***

| Vol. I–I - Cost and Fee/Profit Evaluation | | |
|---|---|---|
| **Proposed** | **H2C**<br>**[Intervenor]** | **HTDA**<br>**[Protestor]** |
| Total Proposed Transition Cost | $[redacted] | $[redacted] |
| Total Proposed Key Personnel Cost | $[redacted] | $[redacted] |
| Total Proposed Labor Cost** | $532,737,367 | $473,834,006 |
| Total Proposed Fee/Profit | $[redacted] | $[redacted] |
| **Total Proposed Price** | **$629,863,486** | **$559,574,265** |
| **Evaluated** | | |
| Probable Cost Adjustment | - | $58,903,361 |
| **Total Evaluated Price** | **$629,863,486** | **$618,477,626** |

\*\* Labor costs are for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours

Notably, protestor's revised price proposal and intervenor's revised price proposal in the October 2023 submissions, were changed from protestor's initial proposal and intervenor's initial price proposal as submitted on January 10, 2023.[10]

---

[10] The initial proposals, as submitted by protestor HTDA and intervenor H2C on January 10, 2023, were evaluated by the agency as follows:

| Vol. II - Technical & Management Evaluation Factors* | HTDA<br>[Protestor] | H2C<br>[Intervenor] |
|---|---|---|
| Key Personnel | Outstanding | Outstanding |
| Past Performance | Good | Good |
| Management Approach | Good | Good |
| **Vol. III - Cost and Fee/Profit Evaluation** | **HTDA** | **H2C** |
| **Total Evaluated Price** | **$655,017,626** | **$635,083,6485** |

After the revised proposals were submitted and evaluated by the agency, the Department of Energy could no longer accept either of the initial proposals, and the initial proposals were not before the Source Selection Authority when making a decision on contract award in the February 24, 2024 Source Selection Decision Document.

The Source Selection Authority's initial evaluation of proposals and award decision were mooted by the court's earlier decision on June 12, 2023 in Case No. 23-683C and the subsequent corrective action taken by the agency. In the above captioned bid protest, the lapse in SAM registration by intervenor in its initial proposal and evaluation by the agency, as documented and analyzed by the court in its June 12, 2023 decision, is not part of the evaluation of the revised proposals following the corrective action, as evaluated by the agency, as the earlier offers by both protestor and intervenor were no longer before the agency and were not "offers" pursuant to which the agency could award a contract. See FAR 2.101.

Furthermore, there is no allegation that there was any lapse in H2C's SAM registration between the submission of its revised proposal on October 23, 2023 and the award to intervenor on February 29, 2024. Therefore, there is no violation of FAR 52.204-7(b)(1) after the corrective action in the protest currently before this court in Case No. 24-440C. Thus, as intervenor's revised proposal meets the SAM requirements of FAR 52.204-7(b)(1), even without consideration of the protestor's challenge to the agency-wide Class Deviation that was issued by the Department of Energy regarding SAM compliance.

Cost

Separate from protestor's SAM registration arguments, protestor argues that the agency conducted a flawed cost realism evaluation. First, protestor argues that "[t]he DOE improperly evaluated Cost Realism beyond Transition Costs." As described above, the agency made an upwards price adjustment of $58,903,361.00 to protestor's evaluated price, raising protestor's total evaluated price from $559,574,265 to $618,477,626. As quoted above, for the price, the Solicitation stated:

**M.5 Evaluation Factor – Cost and Fee/Profit**

The Cost and Fee/Profit Proposal will not be adjectivally rated or point scored, but will be considered in the overall evaluation of proposals in determining the best value to the Government. The Cost and Fee/Profit Proposal will be evaluated for cost realism and price reasonableness in accordance with FAR 15.404-1 and price [sic] FAR 15.402(a). Cost realism analysis will be performed on the Offeror's proposed Transition Task Order costs. This analysis will be used to determine whether the proposed cost elements are realistic for the work to be performed and reflect a clear understanding of the transition requirements. The transition cost proposal will be compared to the Volume II proposal for consistency and understanding of the requirements. Price reasonableness will be performed

on both the proposed fully burdened labor rates (excluding fee) for the period February 1, 2023 through January 31, 2024 applied to the DOE provided Estimated Direct Productive Labor Hours and of the proposed key personnel costs. Key personnel compensation is capped at $568,000 for each designated key person, as established by Section 702 of the Bipartisan Budget Act of 2013.

For purposes of determining the best value, the evaluated price will be the total of the proposed fee/profit (all fee/profit proposed by Task Order type) for a 1-year period (not exceeding the identified fee limitations), proposed costs for Key Personnel (up to the compensation limits shown above), proposed costs for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours (Offeror's additional proposed direct labor categories included in L-6g shall not be used to compute the evaluated price for award purposes), and realistic costs for the Transition Task Order period. Mathematical errors shall be corrected to compute the evaluated price. An Offeror that proposes a fee amount exceeding the maximum prescribed available award fee, target fee, and/or fixed fee amounts as specified in Section L may be considered unacceptable for award.

(capitalization and emphasis in original; alteration added).

Protestor argues that "the RFP expressly limited the DOE's cost realism evaluation to transition costs with no qualifying language," and accurately quotes the Source Evaluation Board Report, which determined: "HTDA's [protestor's] costs and fees are reasonable (Key Personnel and Fully Burdened Labor Rates), realistic (Transition) and in alignment with RFP requirements. Transition – The SEB reviewed the proposed Transition costs and resources, and performed a cost and technical review, resulting in a determination that the proposed resources/costs are realistic." (capitalization in original; alteration added). Therefore, protestor contends, "even though the RFP stated that the Agency's cost realism evaluation would be limited to transition costs **and** that the Agency would evaluate Fully Burdened Labor Rates only for price reasonableness, the DOE exceeded both express limitations." (emphasis in original). By making the $58,903,361.00 price adjustment, protestor argues, "the DOE did not adhere to the RFP's stated methodology for evaluating cost realism." In response, defendant argues that FAR 15.402 allowed the agency to use "cost realism techniques to conclude that HTDA's total price was unreasonable," "[a]nd thus, DOE reasonably adjusted HTDA's price proposal." (alteration added). Intervenor argues that the Solicitation describes

specific steps that DOE will take as part of its evaluation of the Cost and Fee/Profit Proposal, including a realism assessment for transition costs and a reasonableness assessment for fully-burdened labor rates. But in describing these specific steps, the Solicitation never advises that these are the "only" steps DOE will take, as HTDA suggests.

(emphasis in original; internal reference omitted).

FAR 15.402(a) provides:

Contracting officers shall—

(a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer—

. . .

(3) Obtain the type and quantity of data necessary to establish a fair and reasonable price, but not more data than is necessary. Requesting unnecessary data can lead to increased proposal preparation costs, generally extend acquisition lead time, and consume additional contractor and Government resources. Use techniques such as, but not limited to, price analysis, cost analysis, and/or cost realism analysis to establish a fair and reasonable price. If a fair and reasonable price cannot be established by the contracting officer from the analyses of the data obtained or submitted to date, the contracting officer shall require the submission of additional data sufficient for the contracting officer to support the determination of the fair and reasonable price.

FAR 15.402(a)(3) (omission added).

Defendant argues:

HTDA maintains that DOE could not even look at the realism of its proposed base labor rates or adjust HTDA's proposed price based on its unrealistic labor rates. This is because the solicitation identified certain cost elements for which DOE would conduct cost realism analyses, and base labor rates were not among them. This attempt to write FAR 15.402(a) out of the solicitation resembles a disfavored "repeal[] by implication." Maine Community Health Options v. United States, 590 U.S. 296, 315 (2020). Rather, the correct analysis is whether the solicitation expressly forbade any cost realism analyses of labor rates. DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1311 (Fed. Cir. 2021) (cost and pricing FAR provisions are "are permissive, not prohibitive").

FAR 15.402(a)(3) is unambiguous. Agencies may "[u]se techniques such as, but not limited to, price analysis, cost analysis, and/or **[1]** cost realism analysis **[2]** to establish a fair and reasonable price." Id. That is all that happened here. DOE conducted a cost realism analysis and used that analysis to "establish a fair and reasonable price." Id. As a result, the FAR-[sic] required "fair and reasonable price," id., for HTDA's proposal required adjustment.

(all emphasis in original; last alteration added).

In Agile Defense, Inc. v. United States, 959 F.3d 1379 (Fed. Cir. 2020), the United States Court of Appeals for the Federal Circuit cautioned against "'unduly circumscrib[ing] a contracting officer's discretion and hamstring[ing] a contracting agency's efforts to ensure that the 'estimated proposed cost elements are realistic for the work to be performed.'" Id. at 1385 (quoting 48 C.F.R. § 15.404-1(d)(1)) (alterations added). In Agile Defense, the Federal Circuit examined the scope of FAR 15.404-1, titled, "Proposal analysis techniques:"[11]

> Agile contends that DISA's [Defense Information Systems Agency's] cost realism analysis "violated the express terms of the [Encore III solicitation]." In support, it argues that while the solicitation required DISA to review and evaluate an offeror's supporting documentation for Below-Deviation Labor Rates, it prohibited expanded scrutiny of an offeror's Within-Deviation Labor Rates. According to Agile, it would have been selected for a contract award had DISA "adhered to the Solicitation's express terms and found [its Within-Deviation Labor Rates] realistic by virtue of being within one standard deviation of the average."

> We do not find this argument persuasive. The Encore III solicitation required DISA to assess each offeror's proposed CR rates "using one or more techniques defined in FAR 15.404" in order to determine whether those rates were "complete, reasonable, and realistic." It also instructed the agency to calculate, based upon an examination of all completed proposals in each suite of offerors, the average proposed labor rate for each LCAT [labor category]. Next, the agency was directed to use statistical analysis to divide each offeror's estimated CR labor rates into two groups: Below-Deviation Labor Rates, i.e., rates that were more than one standard deviation below the average rates, and Within-Deviation Labor Rates, i.e., rates that fell within one standard deviation of the average rates. The solicitation further stated that DISA was required to "review the submitted supporting documentation" for each Below-Deviation Labor Rate and, if the documentation provided "inadequate or no justification . . . for any

---

[11] The Federal Circuit in Agile Defense, Inc. v. United States specifically examined FAR 15.404-1(d)(1), which states:

> Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

FAR 15.404-1(d).

component of that rate," the agency was directed to make adjustments to that rate when calculating the "Most Probable Cost" for each offeror.

Contrary to Agile's assertions, however, nothing in the Encore III solicitation prohibited DISA from evaluating an offeror's supporting documentation for Within-Deviation Labor Rates. Agile's argument that the agency was barred from conducting an expanded cost realism analysis on its Within-Deviation Labor Rates hinges on the following solicitation provision: "The Government considers a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404." According to Agile, this statement means that DISA was required to accept all Within-Deviation Labor Rates as "realistic" and was therefore prohibited from performing any further cost realism analysis on those rates.

Agile's truncated reading falls flat. The solicitation does not state that Within-Deviation Labor Rates must be deemed "realistic," but rather that those rates will be considered "realistic . . . <u>subject to cost analysis techniques in accordance with FAR 15.404</u>." (emphasis added). In other words, Within-Deviation Labor Rates are not per se realistic, but instead may undergo additional cost realism scrutiny pursuant to the various cost analysis methods and procedures sanctioned by the FAR. <u>See</u> <u>Federal Claims Decision</u>, 143 Fed. Cl. at 18–19 ("[T]he language in the Solicitation was not so limited as to prevent the Agency from performing cost realism analysis on labor rates that fell within one standard deviation of the average."). In this regard, the Encore III solicitation specifically states that DISA was required to assess the "[CR [cost realism]] portion" of each offeror's proposal to determine whether it was "realistic." Agile points to nothing in the language of the solicitation—or in the FAR—that limited DISA's authority to thoroughly assess the cost realism of the entire "[CR] portion" of its proposal, including its Within-Deviation Labor Rates.

Agile contends that because the solicitation explicitly required DISA to review the supporting documentation for Below-Deviation Labor Rates, it implicitly precluded the agency from extending that review to other proposed rates. We disagree. As we have repeatedly recognized, "[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." <u>Impresa</u> <u>[Construzioni Geom. Domenico Garufi v. United States]</u>, 238 F.3d at 1332 (citation and internal quotation marks omitted); <u>see</u> <u>also</u> <u>Tinton Falls Lodging Realty, LLC v. United States</u>, 800 F.3d 1353, 1358 (Fed. Cir. 2015); <u>Savantage Fin. Servs., Inc. v. United States</u>, 595 F.3d 1282, 1286 (Fed. Cir. 2010). Agile cites to no authority suggesting that a solicitation, by instructing a contracting agency to perform a rigorous cost analysis on certain proposed rates, thereby strips it of the power to conduct an expanded cost realism analysis on other proposed rates. To the contrary, such a rule would unduly circumscribe a contracting officer's discretion and hamstring a

contracting agency's efforts to ensure that the "estimated proposed cost elements are realistic for the work to be performed," 48 C.F.R. § 15.404-1(d)(1).

The regular view of the Court of Federal Claims, which we approve, is that contracting agencies enjoy wide latitude in conducting the cost realism analysis. See, e.g., Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." (citation and internal quotation marks omitted)); Dellew Corp. v. United States, 128 Fed. Cl. 187, 194 (2016) ("The Agency has demonstrated that it considered the information available and did not make irrational assumptions or critical miscalculations. To require more would be infringing on the Agency's discretion in analyzing proposals for cost realism." (citation and internal quotation marks omitted)); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)). Such an approach comports with the FAR, which provides examples of cost analysis techniques, but does not mandate the use of any specific methodology. See 48 C.F.R. § 15.404-1(c). Instead, it instructs that "[t]he Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition." Id. § 15.404-1(c)(2); see also id. § 15.404-1(d)(2)(i) (explaining that a cost realism analysis "should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal").

Agile Def., Inc. v. United States, 959 F.3d at 1384–86 (emphasis in original; first, fourth, sixth, and ninth alterations added; internal references omitted).

The Federal Circuit in DynCorp International, LLC v. United States, 10 F.4th 1300 (Fed. Cir. 2021) also spoke to the scope of FAR 15.404-1, "Proposal analysis techniques,"[12] which informs this court's view of how the agency in the above captioned protest may evaluate the proposals. The Federal Circuit determined:

---

[12] The Federal Circuit in DynCorp International, LLC v. United States specifically examined FAR 15.404-1(b)(3), which states:

The first two techniques at 15.404–1(b)(2) are the preferred techniques. However, if the contracting officer determines that information on competitive proposed prices or previous contract prices is not available or is insufficient to determine that the price is fair and reasonable, the contracting officer may use any of the remaining techniques as appropriate to the circumstances applicable to the acquisition.

In our view, FAR 15.404-1(b)(3) does not conditionally prohibit a contracting officer from using any particular price-analysis technique. Rather, FAR 15.404-1 leaves the choice of price-analysis technique to a contracting officer's reasonable judgment in the context of an individual procurement.

As an initial matter, we reiterate that "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa [Construzioni Geom. Domenico Garufi v. United States], 238 F.3d at 1332 (cleaned up). "Contracting officers are given broad discretion in their evaluation of bids," and when a decision within the scope of that discretion "is reasonable[,] a court may not substitute its judgment for that of the agency." R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Naturally, an agency has no discretion to disregard binding regulations. E.g., 5 U.S.C. § 706(2). But proposal price-reasonableness analysis otherwise sits comfortably amid this discretionary background.

In Agile Defense, this court considered discretion in cost-realism analysis— a facet of proposal evaluation similar to price-reasonableness and also based in FAR 15.404-1. And there we endorsed the Court of Federal Claims' view that "contracting agencies enjoy wide latitude in conducting the cost realism analysis." Agile Def.[, Inc. v. United States], 959 F.3d at 1385–86 (cautioning against "unduly circumscrib[ing] a contracting officer's discretion and hamstring[ing] a contracting agency's efforts"). These principles extend to price reasonableness too. Indeed, the Court of Federal Claims has observed as much. After all, the point of a price-reasonableness analysis is to protect the public from paying a price that is too high for what is being procured. See Agile Def., 959 F.3d at 1384. And what exactly is "reasonable" is a judgment based on the specifics of the government's needs.

Against this backdrop, we consider the interpretive question before us. We agree with the Court of Federal Claims: FAR 15.404-1(b)(2) and (3) are permissive, not prohibitive.

The FAR states that the government "may use various price analysis techniques and procedures to ensure a fair and reasonable price." FAR 15.404-1(b)(2) (emphasis added); see FAR 2.101 ("May denotes the permissive."). It explains that the listed techniques are nonlimiting "examples." FAR 15.404-1(b)(2). Further, the provision states that the first two techniques are simply "preferred." FAR 15.404-1(b)(3). "Preferred" expresses here a suggestion, not a strict hierarchy. In this context, "preferred" does not mean "required" but instead "encouraged." See also,

---

FAR 15.404-1(b)(3).

e.g., Webster's Third New International Dictionary (1961) (defining "prefer" as "like better : value more highly"). It is more "should" than "shall." See AT&T v. United States, 307 F.3d 1374, 1379–80 (Fed. Cir. 2002) (interpreting regulations as a "caution," "not a prohibition," where text provided that a preferred type of contract conditionally "should be considered"); Qwest Corp. v. FCC, 258 F.3d 1191, 1200 (10th Cir. 2001) (explaining that "should" conveys "recommended course of action" but does not imply obligation of "shall").

DynCorp points to what it views as limiting prohibitory language: namely, that "if the contracting officer determines that information on competitive proposed prices or previous contract prices is not available or is insufficient to determine that the price is fair and reasonable, the contracting officer may use any of the remaining techniques as appropriate." FAR 15.404-1(b)(3). Here we do not read "if" to mean <u>only</u> if." And at any rate (assuming that the information is "available"), the "if" clause at most asks for a determination that the preferred technique is "insufficient to determine that the price is fair and reasonable."

The nature of this supposed "determination" confirms our view. "Insufficient" in this context is a judgment call. The yardstick by which sufficiency is measured here is not some specific rule, formula, calculation, or detailed fact-finding. Rather, it is the reasonable-discretion-informed appropriateness of the technique under the circumstances. In exercising her fact-specific judgment to select a price-analysis technique, a contracting officer will reasonably view some to be suitable and some not—in a manner that may be implicit. FAR 15.404-1(b)(3) imposes no further requirement than that. The "if" provision, accordingly, operates not to cabin a contracting officer's discretion but to give the preference whatever weight is due under the circumstances of a particular procurement. Of course, a contracting officer's price analysis must be rational: the choice is committed to discretion, not whim. See 5 U.S.C. § 706. But the plain language of the provision itself is not prohibitive and does not conditionally restrict a contracting officer's discretion.

DynCorp Int'l, LLC v. United States, 10 F.4th at 1310–12 (emphasis in original; first and third alterations added; internal reference and footnote omitted). The Federal Circuit did not limit its analysis to FAR 15.404-1(b)(3), explaining:

We turn next to the FAR as a whole. See Antonin Scalia & Bryan A. Garner, Reading Law 167 (2012) ("The text must be construed as a whole. . . . Context is a primary determinant of meaning. A legal instrument typically contains many interrelated parts that make up the whole."). FAR 15.404-1(b)(3) is part of a larger set of related rules—the Federal Acquisition Regulation. And the broader text of the FAR confirms that this language isn't prohibitive.

To this end, it's useful to look at the language that the FAR uses where it <u>does</u> prohibit or condition certain actions. For instance: "no person may." <u>See, e.g.</u>, FAR 2.101 ("[T]he words 'no person may . . .' mean that no person is required, authorized, or permitted to do the act described."). Or "shall not." <u>See, e.g.</u>, FAR 6.302-1(b) ("This authority shall be used, if appropriate, in preference to the authority in 6.302-7; it shall not be used when any of the other circumstances is applicable.").

It's also revealing to look at the language the FAR uses when <u>requiring</u> action. For one: "shall." <u>See, e.g.</u>, FAR 2.101 ("<u>Shall</u> denotes the imperative."); FAR 15.404-1(a)(2) ("Price analysis <u>shall</u> be used when certified cost or pricing data are not required . . . ." (emphasis added)); FAR 15.404-4(b)(1)(i) ("[The government] [s]hall use a structured approach for determining the profit or fee objective in those acquisitions that require cost analysis . . . ." (emphasis added)). Or "must." <u>See, e.g.</u>, FAR 2.101 ("<u>Must</u> (see 'shall')."). Similarly, the FAR at various points within a single provision uses both "shall" (a command) and "should" or "may" (a preference or permission). <u>See, e.g.</u>, FAR 15.404-1(a); <u>cf.</u> <u>Huston v. United States</u>, 956 F.2d 259, 262 (Fed. Cir. 1992) ("When, within the same statute, Congress uses both 'shall' and 'may,' it is differentiating between mandatory and discretionary tasks.").

What's more, FAR 15.404-1(b) lacks a documentation requirement. Generally, "[c]ontracting officers are not obligated by the APA to provide written explanations for their actions." <u>Impresa [Construzioni Geom. Domenico Garufi v. United States]</u>, 238 F.3d at 1337. And elsewhere the FAR details where documentation of a determination <u>is</u> required. <u>See, e.g.</u>, FAR 15.304(c)(3)(iii) ("Past performance need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition."); FAR 15.208(e) ("The contracting officer must document the contract file when oral withdrawals are made."); FAR 15.407-1(d) ("The contracting officer shall prepare a memorandum documenting both the determination and any corrective action taken as a result."); <u>see also</u> Vectrus [Intervenor Vectrus Systems Corporation] Br. 32–33 & n.8 (collecting examples). Such a requirement is absent here.

Indeed, elsewhere the FAR uses far stronger language for the exact formulation that DynCorp argues here: a default rule prohibiting departure absent satisfying certain conditions. For example, the FAR instructs in source selections that past performance "shall be evaluated" as a factor, but "need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition." FAR 15.304(c)(3)(i), (iii). Accordingly, the FAR drafters' use of "preferred" and "may" here—without an express documentation requirement and

against a discretionary proposal-evaluation backdrop—is consistent with the choice of technique being committed to a contracting officer's discretion.

DynCorp Int'l, LLC v. United States, 10 F.4th at 1312-13 (emphasis in original; last two alteration added).

Consistent with the Federal Circuit's approach in Agile Defense, Inc. v. United States and DynCorp International, LLC v. United States for an agency's analysis of price reasonableness and cost realism, the court finds that, in the above captioned protest, the Department of Energy was not as limited as protestor suggests when evaluating the offerors' price proposals, and the agency was permitted to use price reasonableness and cost realism techniques, despite the more limited language in the Solicitation that "[t]he Cost and Fee/Profit Proposal will be evaluated for cost realism and price reasonableness in accordance with FAR 15.404-1 and price [sic] FAR 15.402(a). Cost realism analysis will be performed on the Offeror's proposed Transition Task Order costs." (alterations added). Furthermore, the agency did evaluate the Transition Task Order costs in its evaluation documents. Therefore, it was not improper for the agency to evaluate protestor's price proposal more fully. See FAR 15.304.

Protestor also argues that the agency "erred in making an upward probable cost adjustment to HTDA's Proposal." Defendant argues the agency concluded "HTDA's proposed labor rates were unreasonably low and bore little resemblance to what the United States will actually pay," and "HTDA's proposed labor rates failed to comply with the Solicitation." Intervenor goes further to argue that protestor's "cost realism arguments fail" and "HTDA's purported proposed cost savings are illusory."

For protestor's revised price proposal, the protestor explained a change in its calculation for Fully Burdened Labor Rates:

We determined the ITDC labor costs for August 1, 2023 through July 31, 2024 using the labor rates provided by DOE in Attachment L-6f for union labor rates, since the union labor rates are based on historical rates for the ITDC scope of work and are consistent with the bargaining agreements provided by the RFP. [redacted] HTDA labor rates [redacted] and are consistent with the terms and conditions of the solicitation, applicable laws, including the wage rate requirements in accordance with the bargaining agreements, Service Contract Labor Standards, Clause H.4 Workforce Transition and Employee Hiring Preferences Including through Period of Performance, and Clause H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (Oct 2017) (Revised). DOE provided estimated direct productive labor hours (DPLH) for each skill as part of the RFP in Attachment L-6b. HTDA considers the labor costs to be reasonable and realistic for the hours provided.

(capitalization in original). As described above, the revised price proposal continued: [redacted]

In the February 21, 2024 Source Evaluation Board Report, the Source Evaluation Board evaluated both protestor's revised proposal and intervenor's revised proposal. Regarding protestor's revised price proposal, in the February 21, 2024 Source Evaluation Board Report, the Source Evaluation Board stated:

**SEB Evaluation:**

Based on the SEB's evaluation, HTDA's [protestor's] costs and fees are reasonable (Key Personnel and Fully Burdened Labor Rates), realistic (Transition) and in alignment with RFP [Solicitation] requirements. Transition – The SEB reviewed the proposed Transition costs and resources, and performed a cost and technical review, resulting in a determination that the proposed resources/costs are realistic. The SEB's evaluation consisted of a review of the proposed direct labor hours, skill mixes and other direct costs determining the proposed resources were sufficient to complete the deliverables and other necessary transition activities within the proposed schedule. The associated cost evaluation reviewed supporting documentation contained within the proposal relating to base labor rates, indirect rates, and other direct costs unit costs to determine the information was realistic. The requirement for an Independent Government Cost Estimate was waived for this procurement. Key Personnel – The SEB reviewed the proposed Key Personnel compensation supporting documentation and obtained input from the Environmental Management Consolidated Business Center's Contractor Human Resources Specialist, resulting in a determination that the proposed costs are reasonable and are within Section M.5's required limitation of $568,000.

Fully Burdened Labor Rates – The SEB reviewed the proposed Fully Burdened Labor Rates reconciling the proposed base labor and indirect rates to the solicitation information (HTDA did not propose any additional indirect rates) and performed a mathematical verification when applying the fully burdened labor rates to provided labor hours. The SEB determined the proposed fully burdened labor rates based on the FY 2021 historical direct labor rates escalated to February 2023 are reasonable.

The SEB negatively questioned the IDIQ Fully Burdened Labor Rates and therefore made a cost adjustment (increased cost) of $58,903,360. Section L-17(b)(5) states the base labor rates are historical FY 2021 escalated to February 1, 2023, and provided for informational purposes. Offerors were not required to use the historical base rate information provided, however in accordance with Section H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017)(Revised) Paragraph (e)(1)(i) Pay states "*The Contractor shall provide equivalent base pay to Incumbent Employees as compared to the base pay provided by the Incumbent Contractors, and*

*reimbursed by the government, for at least the first year of the term of the Contract*".

HTDA provided [redacted] surveys from [redacted] and an explanation of the computation and rationale. However, HTDA did not provide information as to how the [redacted] surveys considered the highly skilled and specialized workforce at the Hanford site that is needed to perform contractual tasks at a nuclear facility and how the [redacted] survey would be in compliance with the H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017) (Revised) requirement. Therefore, the SEB increased the proposed cost using the historical base labor rates information provided in the solicitation.

Fee – The purposed fee is mathematically accurate and within the RFP required guidelines.

(capitalization and emphasis in original; alterations added).

In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority stated:

I agree with the SEB's evaluation of the proposals, overall adjectival ratings, and most of the evaluated significant strengths, strengths, weaknesses, and areas found to be neither strengths nor weaknesses. I also considered the SEB's overall evaluation of the Cost and Fee/Profit proposals in determining the best value to the Government. Their evaluation was thorough, and it effectively presents the positive and negative attributes of the proposals. I considered the SEB's evaluation, and the information provided by the Offerors, and developed a comparative assessment to determine the superior Offeror for this contract. Based on the evaluation conducted by the SEB, my review of the proposals, my discussions with the SEB, and my independent review and judgment, I select H2C for the award of the Hanford ITDC acquisition, as its proposal represents the best value to the Government.

For Price, in the February 24, 2024 Source Selection Decision Document the Source Selection Authority explained:

The SEB Report provided a detailed analysis and evaluation of the Offeror's [sic] Volume III cost and fee/profit proposals. For purposes of determining the best value, the evaluated price includes the total of the proposed fee/profit (all fee/profit proposed by Task Order type) for a 1-year period (not exceeding the identified fee limitations), proposed costs for Key Personnel (up to the compensation limits), proposed costs for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours (Offeror's additional proposed direct labor

categories included in L-6g were not used to compute the evaluated price for award purposes), and realistic costs for the Transition Task Order period.

I reviewed the SEB's analysis and find that it was complete and thorough. I also reviewed the cost and fee/profit evaluation. I reviewed the SEB's analysis of technical and cost adjustments (none) and agree with its evaluations.

(capitalization in original; alteration added).

Protestor argues that

[t]here is no discussion – from the SEB or the SSA [Source Selection Authority] – indicating HTDA's [protestor's] [redacted] were wrong or that the [redacted] HTDA mapped to the workforce after [redacted] were unrealistic. Nor is there any explanation in the record of why such [redacted] or salaries are incorrect. Instead, it appears the DOE mechanically relied upon the Fiscal Year 2021 historical rates furnished to offerors – notwithstanding the actual [redacted] that occurred after the release of the RFP – to make unwarranted upward adjustments to HTDA's proposed Year One labor costs.

(alterations added; internal references omitted). Protestor argues that "[h]ad the DOE properly evaluated the cost realism of HTDA's Fully Burdened Labor Rates, it would have concluded that no upward cost adjustment was warranted. HTDA therefore would have retained its $70 million price advantage for the first year of performance." (alteration added). As noted above, defendant and intervenor are critical of the protestor's attempt to adjust the Fully Burdened Labor Rates to lower the price of the protestor's revised proposal. Defendant argues:

In its October 2023 final proposal revision, HTDA continued to use estimated labor rates for union workers but contended that [redacted]. As a result, [redacted]. In its final proposal revision, HTDA represented that its "labor rates [redacted] and are consistent with" "Clause H.5." But HTDA failed to explain how its survey of want ads was "consistent with" incumbent compensation. Similarly, it failed to explain how its estimated [redacted] related to workers on the TOC [Tank Operations Contract], who would transition to the ITDC.

(internal references omitted; alteration added). Defendant continues: "For many labor categories, even HTDA's high salary estimate was less than DOE's provided rates." Defendant argues that

HTDA contends that [redacted], but even its own <u>high</u> estimates are often lower than DOE's <u>average</u> rate [redacted]. This red flag should have alerted HTDA that its methodology was flawed. And HTDA did not need to rely on want ads. HTDA knew or could have known the TOC workforce's actual [redacted] and pay.

(emphasis in original). Defendant also suggests "[u]nder HTDA's reading of the solicitation, it could have provided labor rates of zero dollars per hour and DOE would have been required to credit this artificially low total price in its best value analysis." (alteration added).

> Intervenor is also dismissive of the protestor's proposed labor rates, arguing:
>
> In the first round of this procurement, both offerors proposed Fully-Burdened Labor Rates that were identical to the rates provided by DOE in Attachment L-6f. For this reason, the two offerors were evaluated as having identical costs of $532,737,367 for the "Total Proposed Labor Cost" component of the Cost and Fee/Profit evaluation. During DOE's corrective action, HTDA decided to take a different approach to improve its competitive position. [redacted], resulting in a reduction of its proposed labor costs from $532,737,367 to $473,834,006. HTDA did not contend that these cost savings would be generated by anything unique about its proposed approach. To the contrary, HTDA asserted that [redacted], and thus, it would [redacted] under the new contract.

(internal references omitted). Intervenor argues:

> DOE recognized HTDA's approach for what it is: a proposal gimmick that does not actually offer any cost savings to DOE compared to any other offeror (and which is also unsupported). Indeed, rather than HTDA's rate adjustments providing a meaningful differentiator between it and H2C, HTDA merely attempted to exploit what it apparently believes to be a loophole in the Solicitation. According to HTDA, it can propose substantially lower labor costs, without actually committing itself to charging DOE any less for the overwhelming majority of the contract; and DOE is precluded from making a cost adjustment to ensure a fair comparison of proposals, even though H2C would experience identical cost savings if HTDA's assumptions are accurate. This is blatant gamesmanship. DOE does not have to accept HTDA's illusory cost savings as a differentiator between the two proposals under the Solicitation and applicable law.

The court has reviewed the concerns raised by both defendant's counsel and intervenor's counsel about the changes to the Fully-Burdened Labor Rates in protestor's revised price proposal. The court is also sensitive to the discretion afforded to the agency, especially to the Source Selection Authority in best value trade-off decisions. See, e.g., E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330. Despite the "substantial discretion" allocated to the procurement officials, the FAR requires the agency and the Source Selection Authority to document their decision.

FAR 15.308 governs the Source Selection Authority's best value determination in government procurement decisions, and states:

The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (2023); see also WellPoint Mil. Care Corp. v. United States, 953 F.3d at 1379. Judges of the United States Court of Federal Claims have interpreted FAR 15.308 to encompass two requirements: 1) the source selection authority "must reach an independent award decision based on a comparative assessment of the proposals against all of the criteria set forth in the solicitation;" and 2) the source selection authority "must document its independent award decision." FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 382; see also Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 335 (2011) ("FAR 15.308 has two relevant requirements: 1) the SSA must use his or her independent judgment in making a source selection and 2) the source selection decision must be documented, including the rationale for any business judgments and tradeoffs made or relied on by the SSA."); Info. Scis. Corp. v. United States, 73 Fed. Cl. at 120 ("'Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the fundamental requirement that their independent judgments be reasonable, consistent with the stated evaluation scheme and adequately documented.'" (quoting Matter of Dyncorp Int'l LLC, No. B–289863, 2002 CPD ¶ 83, 2002 WL 1003564 (Comp. Gen. May 13, 2002))). To be well-documented, the source selection decision "must contain more than conclusory and generalized statements." Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. 723, 735 (2011) (citing Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008) ("Conclusory statements, devoid of any substantive content, have been held to fall short of" the documentation requirement in FAR 15.308.)); see also Progressive Indus., Inc. v. United States, 129 Fed. Cl. 457, 478 (2016), aff'd, 888 F.3d 1248 (Fed. Cir. 2018).

The requirements of FAR 15.308 also have been described as follows:

First, the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford. See, e.g., TRW, Inc. [v. Unisys Corp.], 92 Fed. Cl. [1325,] 1327 [(Fed. Cir. 1996)]; Dismas Charities, Inc. [v. United States], 61 Fed. Cl. [191,] 203 [(2004)]. Doing this, the decisional law demonstrates, obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price. Second, in performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of

a contract nor otherwise quantify the non-cost factors. FAR § 15.308 ("the documentation need not quantify the tradeoffs that led to the decision"); Widnall v. B3H Corp., 75 F.3d 1577, 1580 (Fed. Cir. 1996). But, this is not to say that the magnitude of the price differential between the two offers is irrelevant—logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase. See Beneco Enters., Inc., 2000 C.P.D. ¶ 69, 1999 WL 1713451, at *5 (1999). To conclude otherwise, threatens to "minimize[ ] the potential impact of price" and, in particular, to make "a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium." Coastal Sci. and Eng'g, Inc., 89–2 C.P.D. ¶ 436, 1989 WL 237564, at *2 (1989); see also Lockheed Missiles & Space Co., 4 F.3d at 959–60. Finally—and many cases turn on this point—the agency is compelled by the FAR to document its reasons for choosing the higher-priced offer. Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. Indeed, apart from the regulations, generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions. See Johnson Controls World Servs., 2002 WL 1162912, at *6; Satellite Servs., Inc., 2001 C.P.D. ¶ 30, at *9–11; Si–Nor, Inc., 2000 C.P.D. ¶ 159, 1999 WL 33210196, at *3 (1999).

Serco Inc. v. United States, 81 Fed. Cl. at 496–97 (last alteration in original); see also Croman Corp. v. United States, 106 Fed. Cl. 198, 220 (2012) (citing to the framework discussed in Serco), aff'd, 724 F.3d 1357 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2013). A Judge of the United States Court of Federal Claims has explained under FAR 15.308, "[w]hen assessing differences between proposals, the SSA [Source Selection Authority] should take into consideration not only the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals. 'Looking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality.'" Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (quoting Femme Comp Inc. v. United States, 83 Fed. Cl. at 758) (alterations added); see also AM Gen., LLC v. United States, 115 Fed. Cl. 653, 699 (2014) ("This court has also recognized the limitation of a bare evaluation rating, and the need, in certain circumstances, to go beyond the evaluation rating to understand the value provided by the proposal.").

As described by Judge Smith of the United States Court of Federal Claims,

the Agency is afforded vast discretion in its best-value decision, and "this Court is generally loath[ ] to disturb a best-value award so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made. So long as there exists a rational connection between the facts found and the choice made, the Court will not set a procurement decision aside."

Fluor Fed. Servs., Inc. v. United States, 169 Fed. Cl. 70, 82 (2023) (quoting Perspecta Enter. Sols. LLC v. United States, 151 Fed. Cl. 772, 788 (2020) (internal citations and omissions in original); see also Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. at 235 ("'An agency demonstrates proper exercise of discretion so long as it documents its final award decision and includes the rationale for any business judgments and tradeoffs made.'") (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009)); Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. at 738 ("So long as an agency documents its final award decision and includes the rationale for any business judgments and tradeoffs, the Court will not disturb the agency's decision.").

Upwards Price Adjustment

As quoted above, regarding price, in the February 24, 2024 Source Selection Decision Document the Source Selection Authority stated, in full:

> The SEB Report provided a detailed analysis and evaluation of the Offeror's [sic] Volume III cost and fee/profit proposals. For purposes of determining the best value, the evaluated price includes the total of the proposed fee/profit (all fee/profit proposed by Task Order type) for a 1-year period (not exceeding the identified fee limitations), proposed costs for Key Personnel (up to the compensation limits), proposed costs for the FY 2023 fully burdened labor rates (excluding fee) applied to the DOE provided Estimated Direct Productive Labor Hours (Offeror's additional proposed direct labor categories included in L-6g were not used to compute the evaluated price for award purposes), and realistic costs for the Transition Task Order period.

> I reviewed the SEB's analysis and find that it was complete and thorough. I also reviewed the cost and fee/profit evaluation. I reviewed the SEB's analysis of technical and cost adjustments (none) and agree with its evaluations.

(capitalization in original; alteration added). This Source Selection Authority statement alone in the February 24, 2024 Source Selection Decision Document, however, is insufficient to justify the $58,903,361.00 upward price adjustment to increase the protestor's evaluated price in protestor's revised price proposal. The Source Selection Authority is required to document the rationale in the February 24, 2024 Source Selection Decision Document, the court finds that in this case, the Source Evaluation Board's decision, reflected in the February 21, 2024 Source Evaluation Board Report and referenced by the Source Selection Authority, also was not fully enough explained or justified. See Progressive Indus., Inc. v. United States, 129 Fed. Cl. at 478; Akal Sec., Inc. v. United States, 103 Fed. Cl. at 335. As quoted above, the Source Evaluation Board evaluations and conclusions in the February 21, 2024 Source Evaluation Board Report, which the Source Selection Authority reviewed and agreed with in the February 24, 2024 Source Selection Decision Document, did provide some explanation and indicated:

**SEB Evaluation:**

Based on the SEB's evaluation, HTDA's [protestor's] costs and fees are reasonable (Key Personnel and Fully Burdened Labor Rates), realistic (Transition) and in alignment with RFP [Solicitation] requirements. Transition – The SEB reviewed the proposed Transition costs and resources, and performed a cost and technical review, resulting in a determination that the proposed resources/costs are realistic. The SEB's evaluation consisted of a review of the proposed direct labor hours, skill mixes and other direct costs determining the proposed resources were sufficient to complete the deliverables and other necessary transition activities within the proposed schedule. The associated cost evaluation reviewed supporting documentation contained within the proposal relating to base labor rates, indirect rates, and other direct costs unit costs to determine the information was realistic. The requirement for an Independent Government Cost Estimate was waived for this procurement. Key Personnel – The SEB reviewed the proposed Key Personnel compensation supporting documentation and obtained input from the Environmental Management Consolidated Business Center's Contractor Human Resources Specialist, resulting in a determination that the proposed costs are reasonable and are within Section M.5's required limitation of $568,000.

Fully Burdened Labor Rates – The SEB reviewed the proposed Fully Burdened Labor Rates reconciling the proposed base labor and indirect rates to the solicitation information (HTDA did not propose any additional indirect rates) and performed a mathematical verification when applying the fully burdened labor rates to provided labor hours. The SEB determined the proposed fully burdened labor rates based on the FY 2021 historical direct labor rates escalated to February 2023 are reasonable.

The SEB negatively questioned the IDIQ Fully Burdened Labor Rates and therefore made a cost adjustment (increased cost) of $58,903,360. Section L-17(b)(5) states the base labor rates are historical FY 2021 escalated to February 1, 2023, and provided for informational purposes. Offerors were not required to use the historical base rate information provided, however in accordance with Section H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017)(Revised) Paragraph (e)(1)(i) Pay states "*The Contractor shall provide equivalent base pay to Incumbent Employees as compared to the base pay provided by the Incumbent Contractors, and reimbursed by the government, for at least the first year of the term of the Contract*".

HTDA provided [redacted] surveys from [redacted] and an explanation of the computation and rationale. However, HTDA did not provide information as to how the [redacted] surveys considered the highly skilled and

specialized workforce at the Hanford site that is needed to perform contractual tasks at a nuclear facility and how the [redacted] survey would be in compliance with the H.5 DOE-H-2001 Employee Compensation: Pay and Benefits (October 2017) (Revised) requirement. Therefore, the SEB increased the proposed cost using the historical base labor rates information provided in the solicitation.

Fee – The purposed fee is mathematically accurate and within the RFP required guidelines.

(capitalization and emphasis in original; alterations added). Even with this more fulsome explanation, the court agrees with the protestor that "[t]here is no discussion – from the SEB or the SSA – indicating HTDA's [redacted] assumptions were wrong or that the [redacted] HTDA mapped to the workforce after [redacted] were unrealistic. Nor is there any explanation in the record of why such [redacted] assumptions or salaries are incorrect." (alterations added; internal references omitted). The agency did not adequately document the decision to increase protestor's evaluated price by almost 59 million dollars in the decision documents before the court which were included in the Administrative Record. Unlike in Thalle/Nicholson Joint Venture v. United States, 164 Fed. Cl. 224, the Department of Energy failed to include a sufficient rationale for the evaluated price increase to protestor's revised proposal. See id. at 235 ("'An agency demonstrates proper exercise of discretion so long as it documents its final award decision and includes the rationale for any business judgments and tradeoffs made.'" (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. at 514); see also Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. at 738. In the protest currently before this court, the agency's insufficiently explained determination to include a $58,903,361.00 upwards price adjustment to protestor's revised price proposal was arbitrary and capricious.

Best Value Trade-Off

Protestor argues "DOE's Best Value Tradeoff and Source Selection Decision are unreasonable." First, protestor referencing the SAM registration issues, again argues that "[b]ecause H2C is ineligible for award, and Amendment 6 cannot change that, the source selection decision is necessarily arbitrary and capricious." Protestor further argues that, "as a result of the prejudicial cost evaluation errors, the best value tradeoff and award decision are also arbitrary and capricious." (alteration added). Defendant responds that protestor's challenge to the best value trade-off on the basis of SAM registration "fails." Defendant also argues that "DOE's Best Value Determination was lawful and reasonable." Intervenor argues protestor's challenge to the best value trade-off on the basis of SAM registration "fails," and "HTDA [protestor] merely disagrees with the SSA's [Source Selection Authority's] judgment, which is insufficient to render the award decision arbitrary and capricious." (alterations added).

As indicated above, the United States Court of Appeals for the Federal Circuit has explained that procurement officials have a greater degree of discretion when it comes to best-value determinations, as compared to a procurement based on price alone. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the

contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also Croman Corp. v. United States, 724 F.3d at 1363 (noting the significant discretion contracting officers possess when awarding contracts on the basis of best value to the agency) (citing Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355)); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327–28)); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); Eagle Hill Consulting, LLC v. United States, 171 Fed. Cl. 115, 140 (2024); SSI Claimsnet, LLC v. United States, 170 Fed. Cl. 725, 747 (2024); AM Gen., LLC v. United States, 115 Fed. Cl. at 697; Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. at 329 ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)) (alteration in original).

In E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in best value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

. . .

> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

E.W. Bliss Co. v. United States, 77 F.3d at 449 (first omission in original; second alteration in original); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 908 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); COMINT Sys. Corp. v. United States, 700 F.3d at 1384 (quoting same); Tyler Const. Grp. v. United States, 570 F.3d at 1334 (citing same); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting same); Galen Med. Assoc., Inc. v. United States, 369 F.3d at 1330 (quoting same); R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing same).

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion"; "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. at 33; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; E.W. Bliss Co. v. United States, 77 F.3d at 449); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Cleveland Assets, LLC v. United States, 883 F.3d at 1382 ("The arbitrary and capricious standard of review is 'highly deferential,' and procurement officials 'have a great deal of discretion' in their decisions, particularly when, as here, 'the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.'" (quoting Croman Corp. v. United States, 724 F.3d at 1363)).

> Protestor claims that "[i]n addition to the fact of H2C's ineligibility [on the basis of SAM registration], the SSA failed to rationally document how H2C's perceived advantage with respect to a few discrete elements of the equally-rated evaluation factors justified what will be a price premium of **up to $1 billion** over the life of the contract." (emphasis in original; alterations added).

> In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority provided a table summarizing the evaluation of the Technical and Management Proposal evaluation factors for the three broad, adjectival factors and the ratings assigned for the two offerors:

83

| –Vol. II - Technical & Management Evaluation Factors* | H2C | HTDA |
|---|---|---|
| Key Personnel | Outstanding | Outstanding |
| Past Performance | Good | Good |
| Management Approach | Good | Good |

In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority next explained the discriminators between the two revised proposals for each of the three adjectival factors for each offeror, albeit the same overall adjectival ratings, were reviewed. In the February 24, 2024 Source Selection Decision Document, for the Key Personnel evaluation factor, the Source Selection Authority determined:

### Factor 1 – Key Personnel – SSA Assessment Summary

I considered the SEB's evaluation of the Key Personnel proposed by each Offeror, the information provided by the Offerors in their proposals, and information I obtained from attending the Key Personnel interviews. . . . [T]he SEB evaluated both H2C and HTDA as Outstanding. I reviewed and considered the substance and nature of the Significant Strength and Strength ratings. I agree with the SEB's evaluation and overall adjectival ratings assigned to the two Offerors for Factor 1, however, I find clear discriminators between the Offerors' proposed required and non-required Key Personnel, as to demonstrated leadership and experience in current and previous positions that are very similar and similar to their proposed positions. I find that although analogous ratings were assigned, there are clear discriminators that provide me with more or less confidence in suitability for the proposed position and likelihood of success. I find discriminators in favor of H2C relative to HTDA. Based on my comparative assessment, the H2C proposal demonstrates a very high probability of successful contract performance, exhibits very limited risk and is clearly more advantageous than the HTDA proposal for this factor. As discussed below, the H2C Operations Manager and [redacted] clearly provide more depth and breadth in qualifications and similar experience to ITDC. The H2C Operations Manager and equally qualified Program Manager, provide me with significant confidence in leading this new critical mission change from DFLAW [Direct Feed Low-Activity Waste] construction to 24/7 operations. As noted below, I view both Program Managers as equally suitable, however I have less confidence in the HTDA Operations Manager, as discussed below. Moreover, the H2C proposed [redacted] brings significant diverse experience from different DOE and commercial sites that will be invaluable in safety culture and pivoting from construction to 24/7/365 operations.

**I find that overall, for Factor 1, Key Personnel, H2C is the superior Offeror over HTDA. Factor 1, the most important technical evaluation**

**factor, is a major discriminator and results in a significant advantage for H2C over HTDA.**

(capitalization and emphasis in original; alterations and omission added). After comparing each of the key personnel for each offeror, based on the Source Evaluation Board's evaluations in the February 21, 2024 Source Evaluation Board Report and attending the Key Personnel interviews, the Source Selection Authority independently determined in the February 24, 2024 Source Selection Decision Document:

> Overall, in my assessment, H2C offered the better Operations Manager and [redacted] and offered a unique function of [redacted]. The SEB evaluated each of these three H2C positions as a Significant Strength. I agree with the SEB. As stated above, I found both PMs equally suitable for the Program Manager position. Per Section M.2 of the solicitation, the PM [Program Manager] and Operations Manager are considered the most important aspects of the evaluation of key personnel and of equal importance. Therefore, I found a clear advantage of the H2C proposed key personnel team over the HTDA proposed key personnel team.
>
> **I find that overall, for Factor 1, Key Personnel, H2C is the superior Offeror over HTDA. Factor 1 is a major discriminator and results in a significant advantage for H2C over HTDA.**

(capitalization and emphasis in original; alteration added).

For the second adjectival factor, Past Performance, in the February 24, 2024 Source Selection Decision Document the Source Selection Authority reviewed the Source Evaluation Board's evaluation of Past Performance in the February 21, 2024 Source Evaluation Board Report and determined:

**Factor 2 – Past Performance – SSA Comparative Analysis**

> I considered the SEB's evaluation of Past Performance for each Offeror, and I agree with the SEB's adjectival rating of Good for both H2C and HTDA. When I consider the work to be performed, I find that both Offerors have the capability to perform the Hanford ITDC PWS requirements and have a number of Very Relevant and Relevant contracts with positive past performance information that support an expectation of good performance and customer satisfaction with limited risk. Both companies bring past performance from very similar and similar DOE projects with HLW treatment, tank farm and operations at (Hanford, SRS, and Idaho). Both companies have successfully performed on the very similar SRS liquid waste program that the SEB evaluated as a Significant Strength. In addition, both companies bring commercial past performance. This includes the chemical industry past performance on the H2C team, which I found as a positive attribute. The teaming subcontractor past performance is

additionally beneficial to the government. I also considered the negative Past Performance information evaluated. Both Offerors received a Good adjectival rating because the positive past performance information outweighs the negative past performance information. Consequently, I do not find discriminators between H2C and HTDA in the Past Performance evaluation factor.

**I find that overall, for Factor 2, Past Performance H2C and HTDA have comparable past performance and there is no discriminator or advantage.**

(capitalization and emphasis in original).

For the Management Approach evaluation factor, in the February 24, 2024 Source Selection Decision Document, the Source Selection Authority summarized the Source Evaluation Board's evaluation in the February 21, 2024 Source Evaluation Board Report for the two offerors:

**Factor 3 – Management Approach - SEB Evaluations and SSA Determinations**

Factor 3, *Management Approach* includes three elements:
(a) Contract Transition Approach.
(b) Management Approach.
(c) Small Business Participation.
The following Table 7 provides a summary of the SEB's evaluation for Factor 3, including the SEB's adjectival ratings from the SEB Report. Both H2C and HTDA demonstrated a good understanding of the contract requirements, and an effective approach to perform the work that results in a high probability of successful contract performance with a likelihood that performance objectives will be exceeded. This resulted in an adjectival rating of Good. Each of the Significant Strengths/Strengths are further supported in detail within the SEB Report.

Table 7.  Management Approach Evaluation Results

| Offeror | Significant Strengths | Strengths | Weaknesses | Significant Weaknesses | Deficiencies | Adjectival Rating |
|---------|----------------------|-----------|------------|------------------------|--------------|-------------------|
| H2C | 0 | 3 | 0 | 0 | 0 | Good |
| HTDA | 1 | 2 | 0 | 0 | 0 | Good |

(capitalization and emphasis in original).

Both offerors received an overall adjective rating of "Good" for Factor 3, Management Approach, from the Source Evaluation Board, and the Source Evaluation

Board evaluated protestor HTDA's Management Approach as a "Significant Strength" and intervenor H2C's Management Approach as a "Strength."

In the Source Selection Authority's evaluation in the February 24, 2024 Source Selection Decision Document, the Source Selection Authority described the Source Evaluation Board's evaluations in the February 21, 2024 Source Evaluation Board Report and then indicated the Source Selection Authority would give intervenor a "Significant Strength." In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority described the discriminators between the two revised proposals and found that Factor 3, Management Approach was "a discriminator" in favor of intervenor and "**results in a slight advantage for H2C over HTDA**." (emphasis in original). In the February 24, 2024 Source Selection Decision Document the Source Selection Authority determined:

**Overall Management Approach Comparative Analysis**

H2C received three Strengths: one for its contract transition approach, one for its small business contracting, and one for its management approach. HTDA received one Significant Strength for its management approach, one strength for small business subcontracting participation, and one strength for contract transition approach. I found both teams had a strong transition approach but H2C had a slight advantage because they proposed [redacted]. I find that the [redacted] provides me with a higher confidence in successful transition approach and contract performance, which gives a slight advantage to H2C for their transition approach. I found both teams are equal in small business participation, and I have confidence in both.

For Management Approach, although the SEB evaluated HTDA's Management Approach as a Significant Strength and H2C's as a Strength, I would have given H2C a Significant Strength because of the [redacted]. I found that there is slight advantage in favor of H2C because they proposed [redacted]. This represents the essence of end-state contracting in clearly defined scopes of work with associated risk reduction and fiscal environmental liability retirement.

. . .

The SEB rated both H2C and HTDA as Good. Considering the nature of the Significant Strengths and Strengths assigned to each Offeror and applicability to overall contract performance, I find Factor 3 to be a discriminator for H2C over HTDA.

**I find that overall, for Factor 3, Management Approach, H2C is the superior Offeror over HTDA. Factor 3 is a discriminator and results in a slight advantage for H2C over HTDA.**

(capitalization and emphasis in original; omission added).

Protestor states that "[a]lthough the offerors received the same adjectival ratings for all non-cost/price evaluation factors, the SSA concluded H2C offered 'the superior Key Personnel and slightly more advantageous Management Approach.'" (alteration added). Protestor argues that "[t]he reality is that the SSA (and the SEB) not only perceived virtually **no risk with either offeror** performing the ITDC, but also had confidence that both offerors would exceed performance objectives." (emphasis in original; alteration added).

The court finds that, although, according to the Source Selection Authority in the February 24, 2024 Source Selection Decision Document, the adjectival ratings should be considered the same, the Source Selection Authority's comparative analysis did identify legitimate "discriminators" between the two proposals and offered a justification which not was not arbitrary or capricious for why intervenor's revised proposal was stronger than protestor's revised proposal with regard to both Factor 1 and Factor 3. The Source Selection Authority in the February 24, 2024 Source Selection Decision Document specifically noted:

> Overall, in my assessment, H2C offered the better Operations Manager and [redacted] and offered a unique function of [redacted]. The SEB evaluated each of these three H2C positions as a Significant Strength. I agree with the SEB. As stated above, I found both PMs [Program Managers] equally suitable for the Program Manager position. Per Section M.2 of the solicitation, the PM and Operations Manager are considered the most important aspects of the evaluation of key personnel and of equal importance. Therefore, I found a clear advantage of the H2C proposed key personnel team over the HTDA proposed key personnel team.

(alteration added). In the February 24, 2024 Source Selection Decision Document the Source Selection Authority also noted because intervenor H2C proposed [redacted] to lead the transition, the Source Selection Authority had "higher confidence in successful transition approach and contract performance" in intervenor.

Protestor's disagreement with the agency's conclusion that intervenor offered a superior proposal despite the same adjectival ratings, does not support a finding that the agency's decision was arbitrary or capricious. See Def. Base Servs., Inc. v. United States, 147 Fed. Cl. 424, 435 (2020) (citing Metro. Interpreters and Translators, Inc. v. United States, 145 Fed. Cl. 495, 509 (2019)); see also SSI Claimsnet, LLC v. United States, 170 Fed. Cl. at 743–44; Bannum, Inc. v. United States, 91 Fed. Cl. 160, 176 (2009).

Protestor further argues that "as a result of the prejudicial cost evaluation errors, the best value tradeoff and award decision are also arbitrary and capricious." The court has found that the Source Selection Authority did not adequately document the decision to upwardly adjust protestor's price up by $58,903,361.00. The Source Selection Authority, in addition to approving the adoption of the upward price adjustment of protestor's revised price proposal to evaluate protestor's revised price proposal in the February 24, 2024 Source Selection Decision Document, also used the upward price

adjustment in conducting the best value trade-off analysis when comparing protestor's evaluated revised proposal and intervenor's evaluated revised proposal, followed by making the award decision in favor of intervenor. In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority, therefore, used the upwardly adjusted price for protestor's revised proposal to determine that the $11,385,860.00 price differential between protestor's evaluated proposal and intervenor's evaluated proposal did not warrant selecting protestor's less expensive proposal given the technical benefits the government would derive from selection of intervenor's proposal. The Source Selection Authority determined in the February 24, 2024 Source Selection Decision Document:

> Overall, I find the SEB did a thorough analysis of each of the proposals, and that the costs reflect an accurate depiction of the costs that the Government could be expected to pay. Although both proposals have the same adjectival ratings and H2C's evaluated price is slightly higher than HTDA's evaluated price, I find that H2C clearly presents the best value to the government.

> H2C submitted a clearly superior proposal with "Outstanding" Key Personnel, the best Operations Manager and [redacted]. H2C offered [redacted]. In addition, H2C offered [redacted]. The superior Key Personnel and slightly more advantageous Management Approach will not only achieve contract requirements but will likely exceed performance expectations significantly. Finally, I find significant value in H2C's transition approach with [redacted]. I find the technical advantages associated with the H2C proposal outweigh the $11,385,860 (less than 2%) in price difference. Overall, H2C represents a better value than HTDA and therefore, I find the difference in price between HTDA and H2C to be de minimis overall and the value of obtaining a superior Key Personnel team, [redacted], and a more advantageous Management Approach, to be worth the price premium.

The Source Selection Authority's best value trade-off analysis also considered if the upward price adjustment was not considered in the best value trade-off analysis:

> Furthermore, even though I agree with the cost adjustment for HTDA, I believe the price premium is also justified without the cost adjustment (or as proposed). Without the cost adjustment, the proposed prices represent a difference of approximately 12%, or $70,289,221. I also would not consider this price premium to be disproportionate to the benefits associated with the higher technical merit included in the H2C proposal when compared to the HTDA proposal for the reasons cited above. The critical importance of the work scope will take on an even greater role during this contract period as the site moves to 24-hour operations for waste processing. The price difference is not significant in relation to the total site budget (more than $2B annual site budget), and the contractor is responsible for providing task waste operations and processing services that are vital to advancing the

cleanup mission at Hanford. Greater certainty in performance by the ITDC contractor would also justify a price premium of approximately 12%, regardless of the cost adjustment.

In the February 24, 2024 Source Selection Decision Document, the Source Selection Authority, therefore, determined: "The proposal submitted by H2C represents the best value to the Government, since I identified advantages in their technical proposal over the technical proposal of HTDA that are worth the price premium associated with that proposal."

As described above, the Solicitation explained how the proposals would be evaluated by the agency:

**M.6 DOE-M-2011 Relative Importance of Evaluation Factors (Oct 2015)**

(a) The relative importance of the evaluation factors for the Technical and Management Proposal (Volume II) are below.

(1) Key Personnel;
(2) Past Performance; and
(3) Management Approach.

Key Personnel is more important than Past Performance and Management Approach. Past Performance and Management Approach are considered equal in importance.

(b) The evaluation factors for the Technical and Management Proposal (Volume II), when combined, are significantly more important than the total evaluated price (Volume III). Each evaluation factor applicable to this solicitation is identified and described in this and other provisions of this Section M. The descriptive elements of each evaluation factor will be considered collectively in arriving at the evaluated rating of the Offeror's proposal for that evaluation factor. Areas within an evaluation factor are not sub-factors and will not be individually rated, but will be considered in the overall evaluation for that particular evaluation factor.

**M.7 DOE-M-2012 Basis for Award (Oct 2015)**

The Government intends to award one contract to the responsible Offeror whose proposal is determined to be the best value to the Government. Selection of the best value to the Government will be achieved through a process of evaluating each Offeror's proposal against the evaluation factors described above. The evaluation factors for the Technical and Management Proposal will be adjectivally rated. The Cost/Price evaluation factor will not be rated, however the evaluated price will be used in determining the "best value" to the Government. The Government is more concerned with

obtaining a superior Technical and Management Proposal than making an award at the lowest evaluated price. However, the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated superiority of one Offeror's Technical and Management Proposal over another. Thus, to the extent that Offerors' Technical and Management Proposals are evaluated as close or similar in merit, the evaluated price is more likely to be a determining factor in selection for award.

(capitalization and emphasis in original).

The agency made clear that the most important consideration was to obtain "a superior Technical and Management Proposal" over "the lowest evaluated price." Although the Source Selection Authority, in the February 24, 2024 Source Selection Decision Document, did not adequately document acceptance of the Source Evaluation Board's upward price adjustment for protestor in the February 21, 2024 Source Evaluation Board Report, the Source Selection Authority did adequately explain the technical superiority of the intervenor's proposal and best value trade-off determination in the February 24, 2024 Source Selection Decision Document. The explanation of the trade-off for the $70,289,221.00 between protestor's proposal and intervenor's proposal for the first year of the contract was reasonable given the importance of the descriptions of intervenor's technical advantages the Source Selection Authority identified in the February 24, 2024 Source Selection Decision Document. As discussed above, the agency has "a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28); see also E.W. Bliss Co. v. United States, 77 F.3d at 449. As explained by the United States Court of Appeals for the Federal Circuit: "The arbitrary and capricious standard of review is 'highly deferential,' and procurement officials 'have a great deal of discretion' in their decisions, particularly when, as here, 'the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.'" Cleveland Assets, LLC v. United States, 883 F.3d at 1382 (quoting Croman Corp. v. United States, 724 F.3d at 1363). In the protest currently before the court, although the agency failed to adequately document the justification for the price adjustment, and included the upward price adjustment of protestor's revised proposal in its evaluations, the best value trade-off offered specific justifications for valuing the intervenor's revised proposal over protestor's revised proposal, and explained that, even without the price adjustment, the intervenor offered the best value to the agency. Given the agency's stated preference for what the agency considered the "superior Technical and Management Proposal," and the Source Selection Authority's justification for selecting intervenor's revised proposal, the Department of Energy's reasoned trade-off analysis and award decision in favor of intervenor was not arbitrary or capricious. See BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. at 508 ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting

Keeton Corrs., Inc. v. United States, 59 Fed. Cl. at 755 and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381).

Permanent Injunction

Even if a protestor prevails on its claims that an agency conducted an improper price assessment or that an agency's best value trade-off and source selection decision were unreasonable, a protestor still needs to demonstrate that protestor is entitled to the permanent injunctive relief requested in its bid protest complaint. In Centech Group, Inc. v. United States, the United States Court of Appeals for the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States, 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018) (quoting Centech Grp., Inc. v. United States, 554 F.3d at 1037); Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); HealthRev, LLC v. United States, 172 Fed. Cl. 73, 94-95 (2024); Eagle Hill Consulting, LLC v. United States, 171 Fed. Cl. 115, 141 (2024); MVM, Inc. v. United States, 149 Fed. Cl. 478, 492 (2020); Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. 700, 712 (2020); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016). "Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369 (2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010) (second alteration in original; omission in original); see also Computer World Servs. Corp. v United States, 147 Fed. Cl. 584, 595 (2020); Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

Assuming it can succeed on the merits, protestor alleges that it will suffer irreparable harm if the court does not issue an injunction and that the balance of the hardships and the public interest weigh in favor of granting an injunction. Defendant and intervenor contend that protestor has not demonstrated irreparable harm, that the balance of hardships does not weigh in protestor's favor, and that an injunction would not serve the public interest.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)) (first alteration added); see also Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "As to the second factor, irreparable harm exists when an offeror has lost the opportunity to compete fairly for a contract." Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. at 712 (citing HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 245 (2012)). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 245 (citing several cases); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), motion to amend denied, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998)); see also KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 363 (2015) (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."). According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49

(quoting <u>Furniture by Thurston v. United States</u>, 103 Fed. Cl. 505, 520 (2012) (citing <u>BayFirst Sols., LLC v. United States</u>, 102 Fed. Cl. 677, 696 (2012))); <u>see also</u> <u>MORI Assocs., Inc. v. United States</u>, 102 Fed. Cl. 503, 552–53 (2011).

For its irreparable harm argument, protestor contends "because HTDA [protestor] would lose the opportunity to compete for and perform the ITDC, earn the revenue and profits resulting from performance, and gain experience working with the DOE, it has made the requisite showing of harm." (alteration added). Regarding irreparable harm, defendant responds that "HTDA has elected not to provide <u>any</u> evidence supporting its allegations." (emphasis in original). Intervenor suggests that protestor would not suffer irreparable harm as "[o]nly after HTDA learned it had lost the procurement, five months after the class deviation, did it file this protest at the Court." (alteration added). The court notes that the awarded contract could be a ten year contract with a maximum value of services of $45,000,000,000.00. If the court does not issue an injunction, protestor would not have the ability to compete or perform the contract for the Department of Energy for potentially a decade. If the protestor had not been treated fairly in the competitive bidding process for the contract, the loss of this opportunity could favor protestor. <u>See</u> <u>Overstreet Elec. Co. v. United States</u>, 47 Fed. Cl. at 744. As discussed above, however, the court has found that the agency did not act arbitrarily or capriciously when it awarded the contract to intervenor.

Regarding the third factor, the balance of hardships to the respective parties, protestor argues that "[t]he DOE would suffer minimal, if any harm, from an injunction. In the first place, the DOE has an alternative to H2C [intervenor], with an identically rated (and eligible) proposal and a much lower cost: HTDA [protestor]." (alterations added). Defendant simply argues that if this court "leaves the agency with no choice but to award to HTDA, the Government will be deprived of the "clearly superior proposal." Intervenor offers a more robust argument, contending

> [g]ranting injunctive relief would cause substantial harm to DOE and to H2C. It would undermine DOE's ability to ensure the cleanup of dangerous and radioactive nuclear material by the Tri-Party comprehensive cleanup and compliance agreement milestones, which were recently reaffirmed by DOE, the Washington State Department of Ecology, and U.S. Environmental Protection Agency. The first highlighted point from the recent agreement was a commitment to "Maintaining existing timeframes for starting treatment of both low activity and high-level waste by immobilizing it in glass via vitrification." That includes beginning vitrification at the waste treatment plant in 2025, work that DOE believes will be optimally performed by a new contractor that will have integrated management over both the safe storage and vitrification of waste—i.e., the ITDC awardee. Injunctive relief will hamper DOE's forward progress in performance. Further, it would force DOE to divert resources to re-awarding the ITDC contract, while also negotiating a sole-source bridge extension.

(footnote and internal reference omitted; alteration added). As noted by intervenor, if the court issues an injunction the agency would potentially face challenges and delays if the

agency is required to re-compete the Solicitation and make a new award decision. The delays could also put at risk the agency's ability to meet compliance agreement milestones.

Regarding the fourth factor, the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)) (alteration added); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). An important public interest is served for the government to conduct an "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)) (alteration added).

Protestor argues "[t]he public interest also weighs heavily in favor of an injunction. The DOE, and the public at large, has 'a long-term interest in ensuring that any new contract for the services in question truly represents the best overall value to the government.'" (quoting NetStar-1 Gov't Consulting, Inc. v. United States, 98 Fed. Cl. 729, 735 (2011)) (alteration added). Defendant argues that "it is also in the public interest for this contract to move forward as awarded." Again, intervenor provides a thoughtful argument and contends

> there is a compelling public interest in allowing DOE to move forward with the ITDC contract on schedule, with the technically superior offeror. This is a complex and technically challenging contract, with profound implications for public safety. Transition to a new contractor that will manage and vitrify waste has been delayed significantly already, and, as noted, there is a renewed commitment to begin vitrification in 2025. That will be far better accomplished under the new contract aimed at integrated execution of the waste management and vitrification tasks. DOE also should have its first-choice contractor for this important work.

Intervenor also notes "[e]ven if the difference between offerors is very low risk versus extremely low risk, that is important in a contract where a performance failure could mean exposing the public to radiation, cancer, or a myriad of other harms from potential waste

contamination." (alteration added). Therefore, intervenor argues: "Here there is a compelling public interest in moving forward with the best contractor for the job."

In the agency's July 21, 2021 Acquisition Plan, the Department of Energy explained:

> Beginning in 1943, the U.S. Department of Energy (DOE) Hanford Site was constructed to produce plutonium for the first nuclear weapons in World War II. To meet the challenges of the "Cold War," [redacted]. Plutonium production ended in the late 1980s. Today, the Hanford Site is a key DOE industrial complex dedicated to environmental cleanup.

The July 21, 2021 Acquisition Plan continued:

> The Hanford Site sits on 586 square miles of shrub-steppe desert in southeastern Washington State and encompasses over 40 miles of the Columbia River. The Hanford Site cleanup strategy is to eliminate or minimize nuclear materials, spent nuclear fuel (SNF), and waste through safe stabilization, treatment, and/or disposition; reduce the costs of continuing operations and surveillance and maintenance; deactivate and decommission facilities; as well as to remediate surface water, groundwater and contaminated soils consistent with regulatory agreements and permits. The Department's completion strategy provides a comprehensive risk-based methodology to the legacy cleanup project, such as the dispositioning of low-activity tank waste by vitrification at the site's Waste Treatment and Immobilization Plant (WTP) Facilities, and decommissioning facilities including associated infrastructure that are not required for continuing missions. The Hanford Site cleanup is expected to be completed in fiscal year (FY) 2079.

> Beginning in the 1940s with the Manhattan Project, the Hanford Site played a pivotal role in the nation's defense, producing approximately 67 metric tons of plutonium, nearly two-thirds of the United States' supply. After irradiated fuel rods were taken from the nuclear reactors to the processing facilities, they were exposed to a series of chemical processes designed to dissolve away the fuel rod itself, allowing retrieval of the plutonium. The radioactive chemical liquid waste generated during the plutonium extraction process was put into underground storage tanks. [redacted].

The July 21, 2021 Acquisition Plan explained:

> The DOE has a long term need for a contractor to operate the WTP [Waste Treatment and Immobilization Plant] and Tank Farms. The WTP is in varying stages of construction and startup with the low activity waste (LAW) treatment facilities to be commissioned and operated in the near term followed by the high-level waste portion later in the contract period.

(alteration added). As described and quoted above, the Source Selection Authority, in the best value trade-off analysis explained the value of intervenor to contract performance as the awardee of the contract, including the following description:

> Overall, I find the SEB did a thorough analysis of each of the proposals, and that the costs reflect an accurate depiction of the costs that the Government could be expected to pay. Although both proposals have the same adjectival ratings and H2C's evaluated price is slightly higher than HTDA's evaluated price, I find that H2C clearly presents the best value to the government.
>
> H2C submitted a clearly superior proposal with "Outstanding" Key Personnel, the best Operations Manager and [redacted]. H2C offered [redacted]. In addition, H2C offered [redacted]. The superior Key Personnel and slightly more advantageous Management Approach will not only achieve contract requirements but will likely exceed performance expectations significantly. Finally, I find significant value in H2C's transition approach with [redacted]. I find the technical advantages associated with the H2C proposal outweigh the $11,385,860 (less than 2%) in price difference. Overall, H2C represents a better value than HTDA and therefore, I find the difference in price between HTDA and H2C to be de minimis overall and the value of obtaining a superior Key Personnel team, [redacted], and a more advantageous Management Approach, to be worth the price premium.
>
> Furthermore, even though I agree with the cost adjustment for HTDA, I believe the price premium is also justified without the cost adjustment (or as proposed). Without the cost adjustment, the proposed prices represent a difference of approximately 12%, or $70,289,221. I also would not consider this price premium to be disproportionate to the benefits associated with the higher technical merit included in the H2C proposal when compared to the HTDA proposal for the reasons cited above. The critical importance of the work scope will take on an even greater role during this contract period as the site moves to 24-hour operations for waste processing. The price difference is not significant in relation to the total site budget (more than $2B annual site budget), and the contractor is responsible for providing task waste operations and processing services that are vital to advancing the cleanup mission at Hanford. Greater certainty in performance by the ITDC contractor would also justify a price premium of approximately 12%, regardless of the cost adjustment.

(capitalization in original; emphasis added).

In addition to being in the agency's best interest to move forward with intervenor, it is in the public's interest to have the agency avoid the delays associated with another competition towards a new award decision if the court issues an injunction, as the delays could also put at risk the agency's ability to meet compliance agreement milestones, and slow down the progress of treating the waste.

The court finds that the balancing of the hardships and the public interest weighs in favor of the agency being able to expeditiously move forward with contract performance as awarded and move forward with the contractor the Source Selection Authority identified in the best value trade-off analysis as offering "a clearly superior proposal." On balance, the injunctive factors weigh in favor of the agency and against granting a permanent injunction against performance on the contract award. Moreover, as determined above, protestor did not succeed on the merits of protestor's claims and did not demonstrate that agency's evaluations and the Source Selection Authority best value trade-off analysis was arbitrary or capricious.

## CONCLUSION

For the foregoing reasons, as indicated in the earlier oral decision, protestor's bid protest complaint in Case No. 24-440C was not barred by res judicata or waiver. The history of intervenor's SAM registration does not preclude evaluation of intervenor's revised proposal or the contract award before the court in the current bid protest. The agency failed to adequately document the upward adjustment of protestor's price, but the Source Selection Authority did offer a rational decision for the trade-off analysis and best value determination, even if the upwards price adjustment to protestor's revised price proposal was disregarded. In addition, the analysis of the injunctive factors does not favor the protestor. Protestor's motion for judgment on the Administrative Record is **DENIED**. Defendant and intervenor's cross-motions for judgment on the Administrative Record are **GRANTED**. The protestor's bid protest complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**